his [post-judgment] interest because defendant was able to convince the trial court to make an erroneous ruling[ ]"); *Espinoza v. Rossini,* 257 Cal.App.2d 567, 573, 65 Cal.Rptr. 110 (1967) (finding that JNOV entered by trial court, but overruled on appeal results in entitlement to post-judgment interest from date of original verdict: "[t]here is no reason to deprive the winning party of the interest to which he has been entitled from the date of the original entry of the verdict[ ]").

**In the Interest of K.Z.S.**

**Appeal of C.V.S., Mother.**

Superior Court of Pennsylvania.

Argued Feb. 26, 2008.

Filed April 4, 2008.

Vincent J. Giusini, Philadelphia, for appellant.

Jonathan Q. Irvine, Philadelphia, for appellee.

Lisa C. Harding, Philadelphia, for Dept. of Human Services, Participating Party.

BEFORE: KLEIN, GANTMAN, and ALLEN, JJ.

OPINION BY GANTMAN, J.:

¶ 1 Appellant, C.V.S. ("Mother"), appeals from the order entered in the Philadelphia County Court of Common Pleas, which terminated her parental rights as to her minor child, K.Z.S. (DOB 5/19/03). Upon a thorough review of the record and the applicable law, we affirm.

¶ 2 The relevant facts and procedural history of this case are as follows:

[K.Z.S.] was born on May 10, 2003. [K.Z.S.] became known to DHS on May 12, 2003, two days after [K.Z.S.] was born, as a result of a General Protective Services ("GPS") report alleging that [K.Z.S.] and [Mother] tested positive for cocaine at birth. This report was substantiated. On May 13, 2003, [K.Z.S.] was discharged from the hospital and he and [Mother] began residing with Tracy Craig, a family friend. On May 17, Mother left the home of Ms. Craig with [K.Z.S.] and their whereabouts remained unknown until May 20, 2003. On May 20, 2003, DHS obtained a Restraining Order ("RO") against Mother and [K.Z.S.] was placed in the home of Ms. Craig.[1] On May 22, 2003, the [court] lifted the RO and temporarily committed [K.Z.S.] to DHS. Then on May 30, 2003, after an adjudicatory hearing, [the court] adjudicated [K.Z.S.] dependant and fully committed him to DHS. [K.Z.S.] remained in the home of Ms. Craig and has continued to remain there up to the present date.

... In January 2004, Mother moved to Baltimore to try to get adequate hous-

---

1. The RO was based on a report that Mother had taken K.Z.S. to a crack house.

ing. . . . Mother is currently . . . living in Baltimore with three of her other children in a transitional housing program for women and children.

Vicky Melvin, Children's Choice Regional Director, who was the assigned case manager in 2004 from January to June, in 2005 from January until March, and in 2006 from March until June, but was supervising the case the entire time, testified at trial that she was in charge of making sure Mother was completing the goals for her Family Service Plain (FSP) and her Individual Service Plan (ISP). These goals were: (1) Mother to visit consistently, which was twice a month, (2) Mother to complete an outpatient program where she lived, (3) Mother to complete a parenting program, and (4) Mother to obtain suitable housing. Mother was to provide the agency with documentation with completion of all of those goals. Ms. Melvin testified, that prior to the filing of the Petition for Involuntary Termination on January 6, 2005, she had not received any documentation demonstrating compliance of Mother receiving any outpatient services, of Mother completing her parenting classes, or that Mother had located and occupied suitable housing.

Ms. Melvin also testified that Mother was not consistent with her visitations with [K.Z.S.] For the entire visitation period dating from 2003, Ms. Melvin testified that Mother had missed 33 out of 53 scheduled visits, all of which were unexcused. . . . Ms. Melvin testified further that from the time period January 15, 2004 until March 1, 2005, that Mother did not have any contact with the agency and did not give any reasons for why she was missing the visits. Mother did testify that it was difficult to make the visits because she was living in Baltimore and had problems with transportation because she had no money. How-

ever, Ms. Melvin further testified that Mother was instructed that she was responsible for getting to the visits which were in Philadelphia and that Mother did not express to anyone that transportation from Baltimore was a hardship. If Mother would have told the agency that she was having transportation hardships, Ms. Melvin stated that both Children's Choice and DHS would have made sure that she was provided bus fare to come to the visits in Philadelphia.

Ms. Melvin finally testified that Children's Choice is in agreement with the permanency plan of a goal change to adoption based on Mother's non-compliance with consistent visitation as well as not providing the necessary documentation to the agency regarding her drug treatment and parenting programs. She stated, "We are concerned about how long it has taken Mother to complete her goals as well as [K.Z.S.'] bond to the resource parent." When asked about the relationship between [K.Z.S.] and Ms. Craig, Ms. Melvin stated that "Ms. Craig and [K.Z.S.] are very bonded, she has cared for him for many years, and that he looks at her as his primary caregiver, as a mother figure."

Amy Bon Giovanni, another Children's Choice case worker who has been on the case since June of 2006, also testified that Ms. Craig and [K.Z.S.] are very well bonded. She stated . . . , "[K.Z.S.] will refer to Ms. Craig as his Mommy. And then he refers to [Mother] by her first name. When I go to pick him up sometimes for visits, he will cling to Ms. Craig and say I don't want to go see [Mother]. He will say Mommy, I want to stay here with you." She also later testified that [K.Z.S.] told her . . . , "I don't want to live in Maryland, I don't want to move there, I want to stay here with my Mommy [referring to Ms.

Craig]." Even though a bonding evaluation was done by a psychologist, Doctor Elaine Hyman and it stated that [K.Z.S.] was bonded with both Ms. Craig and Mother, Ms. Bon Giovanni stated, in her opinion, it would affect [K.Z.S.] negatively if [he] had to move with Mother to Baltimore. Ms. Bon Giovanni also stated that she was in agreement with DHS position to have the parental rights of Mother terminated. She stated as her reasons for being in agreement ..., "I feel like this [referring to Ms. Craig's home] has been where [K.Z.S.'] been all his life, this is his family now. I understand that [Mother] has done stuff recently [to improve as a parent], but I feel like it is too late, the child doesn't understand or look to her as his Mom. His Mommy is [Ms. Craig]."

(Trial Court Opinion, dated September 19, 2007, at 1–5) (internal citations omitted). DHS filed a petition for a goal change to adoption and involuntary termination of Mother's parental rights on January 6, 2005. The court held hearings on November 3, 2006 and May 21, 2007, and entered an order terminating Mother's parental rights at the end of the second hearing on May 21, 2007. On June 19, 2007, Mother timely filed a notice of appeal. The court ordered Mother to file a Rule 1925(b) statement of matters complained of on appeal on June 20, 2007, which she timely filed on July 2, 2007.

¶ 3 On appeal, Mother raises the following issue for review:

WHETHER THE TERMINATION OF MOTHER'S PARENTAL RIGHTS WAS SUPPORTED BY THE EVIDENCE, WHERE THE TRIAL RECORD ESTABLISHED MOTHER HAD NOT DEMONSTRATED A SETTLED PURPOSE OF RELINQUISHING HER PARENTAL RIGHTS, HAD NOT WILLFULLY FAILED TO PER-

FORM HER PARENTAL DUTIES, HAD REMEDIED THE CONDITIONS WHICH LED TO PLACEMENT AND WHERE THE EVIDENCE FURTHER ESTABLISHED THAT TERMINATION WAS NOT IN THE BEST INTERESTS OF THE CHILD?

(Mother's Brief at 2).

■ ¶ 4 Mother argues she did not demonstrate the neglect or lack of contact required by law to terminate her parental rights. To the contrary, Mother states she has expressed a current and past desire to visit, reunify and contact K.Z.S. Mother also contends she substantially met all of her Family Service Plan Objectives. While Mother acknowledges she missed some visits with K.Z.S., she asserts they were a result of transportation issues, as the visits required her to travel from Baltimore to Philadelphia by bus. Further, Mother blames DHS for her missed visits. Mother also contends the conditions that led to K.Z.S.' placement no longer exist, because she has substantially remedied them. Mother insists her initial neglect of K.Z.S. was not willful, but due instead to her drug addiction. Additionally, Mother stresses she has a bond with K.Z.S., and the court did not consider the effect that severing this bond would have on K.Z.S. Mother concludes this Court should reverse and reinstate her parental rights, because the termination order was improper. We disagree.

¶ 5 Initially, we observe:

The standard and scope of review applicable in termination of parental rights cases are as follows:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error

of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. We may uphold a termination decision if any proper basis exists for the result reached. If the trial court's findings are supported by competent evidence, we must affirm the court's decision, even though the record could support an opposite result.

*In re Adoption of K.J.*, 936 A.2d 1128, 1131 (Pa.Super.2007) (internal citations omitted).

¶ 6 DHS sought involuntary termination of Mother's parental rights on the following grounds:

§ 2511. **Grounds for involuntary termination**

(a) **General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child

continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\* \* \*

23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8); (b). Satisfaction of any one subsection of Section 2511(a), along with consideration of Section 2511(b), is sufficient for involuntary termination of parental rights. *In re Adoption of R.J.S.*, 901 A.2d 502 (Pa.Super.2006).

■ ¶ 7 A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. *In re C.S.* 761 A.2d 1197, 1201 (Pa.Super.2000) (*en banc*). "Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super.2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (citing *In re D.J.S.*, 737 A.2d 283 (Pa.Super.1999)).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; those grounds may also include acts of refusal as well as incapacity to perform parental duties. Nevertheless, parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.

The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(5).

To terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of DHS supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of DHS services.

*In re Adoption of K.J., supra* at 1132–33 (most internal citations and quotation marks omitted).

■ ¶ 8 "The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have [her] parental rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super.2001).

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

\* \* \*

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B., N.M., supra* at 855 (internal citations omitted). Additionally,

It is incumbent upon a parent when separated from [her] child to maintain communication and association with the child. This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert [her]self, to take and maintain a place of importance in the child's life.

*In re G.P.—R.*, 851 A.2d 967, 977 (Pa.Super.2004).

To be legally significant, the [post-abandonment] contact **must be steady and consistent over a period of time,** contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. **The parent wishing to reestablish [her] parental responsibilities bears the burden of proof on this question.**

*In re D.J.S., supra* at 286 (quoting *In re Adoption of Hamilton,* 379 Pa.Super. 274, 549 A.2d 1291, 1295 (1988)) (emphasis added). "[A] parent's basic constitutional

right to the custody and rearing of his … child is converted, upon the failure to fulfill … parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M., supra* at 856.

¶ 9 Once the statutory grounds for termination under Section 2511(a) have been met, the court must consider whether the child's needs and welfare will be met by termination pursuant to Section 2511(b). *In re C.P.,* 901 A.2d 516 (Pa.Super.2006).

> Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.

*Id.* at 520 (internal citation omitted). The court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. *In re Adoption of K.J., supra* at 1134. "In the last sentence of subsection (b), we are instructed that we may not consider any effort by the parent to remedy the conditions described in subsections (a)(1) if that remedy was initiated after the parent was given notice that the termination petition had been filed." *In re D.W.,* 856 A.2d 1231, 1234 (Pa.Super.2004). The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *In re C.S., supra.* Most importantly, adequate consideration must be given to the needs and welfare of the child. *In re J.D.W.M.,* 810 A.2d 688, 690 (Pa.Super.2002).

¶ 10 In the instant case, K.Z.S. was born on May 10, 2003. Both he and Mother tested positive for cocaine. On May 13, 2003, K.Z.S. was discharged from the hospital and he and Mother went to reside with Tracy Craig, a family friend. On May 17, 2003, Mother took K.Z.S. and left Ms. Craig's home. Their whereabouts remained unknown until May 20, 2003. On May 20, 2003, DHS obtained a RO against Mother, and K.Z.S. was placed in Ms. Craig's home. On May 22, 2003, the court lifted the RO and temporarily committed K.Z.S. to DHS. On May 30, 2003, after an adjudicatory hearing, the court adjudicated K.Z.S. dependant and fully committed him to DHS. K.Z.S. has remained in Ms. Craig's home since then. In January 2004, Mother moved to Baltimore and is currently living in Baltimore with three of her other children in a transitional housing program for women and children. The termination petition was filed on January 6, 2005. In evaluating Mother's claims, the court reasoned:

> In the present case, DHS has established by clear and convincing evidence the existence of grounds for terminating the parental rights of Mother. All the requirements of the statute have been satisfied.
>
> The [c]ourt found clear and convincing evidence that the requirements of Section 2511(a)(1) had been satisfied. Mother demonstrated a settled purpose of relinquishing parental claim to [K.Z.S.] and failed to perform parental duties. [K.Z.S.] has been removed from Mother's custody since May 20, 2003, just ten days after [K.Z.S.] was born. Mother moved to Baltimore in January of 2004, and the child has not been reunited with Mother at any point since that date and the child has remained in placement with Ms. Craig for the last four years. Mother's only contact with the child has been through visitation which she has consistently missed. Mother argues that she had

difficulty making the visits because of transportation problems from Baltimore to Philadelphia due to the fact she had no money.[2] Mother chose to move to Baltimore and there is no evidence that Mother considered other alternatives before she decided to move to Baltimore. Furthermore ... Mother did not work diligently to overcome her problems of traveling from Baltimore to Philadelphia to visit [K.Z.S.] She did not have any contact with Children's Choice to tell them why she was missing the visits nor did she tell anyone that she was having transportation problems which would have given Children's Choice or DHS an opportunity to help her overcome these problems.

Mother also has not been in compliance with her FSP and ISP goals. Prior to the filing of the Petition for Involuntary Termination, Mother had not provided Children's Choice or DHS with documentation demonstrating compliance of Mother receiving any outpatient services, of Mother completing her parenting classes, or that Mother had located and occupied suitable housing. There was evidence presented that after January 6, 2006, the date the Petition for Involuntary Termination was filed, that Mother began to comply with her FSP and ISP objectives.... Therefore, the [c]ourt did not consider any of the efforts made by Mother after she received notice of the filing of the Petition.

Because of Mother's lack of compliance prior to the filing of the Petition for Involuntary Termination, the [c]ourt found that Mother has not demonstrated a serious intent to cultivate and maintain a parent/child relationship with [K.Z.S.]

The [c]ourt found clear and convincing evidence that the requirements of Section 2511(a)(2) have been satisfied. Mother evidenced an incapacity and failure to parent, the failure to parent caused the [child] to be without parental care necessary for [his] physical and mental well-being, and Mother's refusal to parent cannot be remedied. Mother does not yet have permanent housing or employment to provide for [K.Z.S.] There is some evidence that the transitional housing program she is in may result in a permanent home and that Mother may be getting employment at a hotel, but there is no documentation so it is only speculative at this point. The [c]ourt found that Mother was given ample time to resolve her issues and complete her FSP and ISP goals and that [K.Z.S.] cannot be kept in limbo any longer.

The [c]ourt found clear and convincing evidence that the requirements of Section 2511(a)(5) and Section 2511(a)(8) have been satisfied. [K.Z.S.] has been removed from Mother for four years, well over the ... six and twelve months required by each section of the statute respectively. Furthermore, ... the [c]ourt found that although Mother has worked hard and may have improved the conditions that led to the removal and placement of [K.Z.S.], Mother did not begin to remedy these conditions

---

**2.** *See In re Adoption of Faith M.*, 509 Pa. 238, 501 A.2d 1105 (1985) (requiring absent parent to remain cautious not to place herself in position that denies her full opportunities to parent; if she does place herself in that position, then she cannot complain when her performance of parental duties is found wanting; stating: "Since communication and association are essential to the performance of parental duty, the absent parent and [her] child are at a disadvantage; and if such a parent is to perform [her] parental duties, even to a more limited extent than when [she] lived with the family, [she] must make special effort to bridge the gulf of geographical separation and to take affirmative steps to maintain communication and association with [her] child ...").

within a reasonable time. She did not begin to improve these conditions until six months after the Petition for Involuntary Termination was filed.[3]

Once the statutory elements of [Section] 2511(a) were satisfied, the [c]ourt conducted a separate and distinct analysis under [Section] 2511(b). The [c]ourt found that the termination of Mother's parental rights would best serve the needs and welfare of [K.Z.S.] The [c]ourt based its finding on the testimony at trial that [K.Z.S.] has been placed with Ms. Craig for the last four years, she has been able to provide for [K.Z.S.'] daily needs, and that [K.Z.S.] recognizes Ms. Craig as his Mommy and has expressed a desire to remain with Ms. Craig. Although the bonding evaluation done by the psychologist stated that [K.Z.S.] is bonded with both Ms. Craig and Mother, the [c]ourt found that to place [K.Z.S.] with Mother would only have a negative impact on [K.Z.S.] and would not be in the best interest of [K.Z.S.] since he has been with Ms. Craig his entire life and wishes to remain with her. While Mother should be commended for getting her life together and becoming a better parent, the [c]ourt found that to best serve the needs and welfare of [K.Z.S.], [K.Z.S.] should remain with Ms. Craig.

(Trial Court Opinion at 7–11) (some internal citations omitted). The competent evidence of record supports the court's determination that the statutory requirements were met under subsection (a). We agree with the court that K.Z.S. should not have to languish in the system for an indefinitely extended time.

¶ 11 Although the text of Section 2511(b) does not expressly require a definitive commentary, the case law calls for interpretation of any parent-child bond. *In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993) and its progeny have shaped the traditional subsection (b) analysis. Thus, if there is any evidence of a bond between the child and the parent whose parental rights are at risk, the wise approach is to have a bonding evaluation and make it part of the certified record.

■ ¶ 12 There are some instances, however, where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child. *See In re K.C.F.*, 928 A.2d 1046 (Pa.Super.2007), *appeal denied*, 594 Pa. 705, 936 A.2d 41 (2007) (reviewing appeal after remand for subsection (b) analysis; case involved three children, ages 11, 9, and 8; Mother was drug and alcohol dependent, previously convicted for endangering welfare of children, sentenced to probation, and subsequently incarcerated; this Court held (1) expert witness was sufficiently qualified to evaluate and testify regarding bond between Mother and each child and whether termination was in children's best interests; (2) expert's evaluation characterized children's bond with Mother as compromised, ambivalent, insecure, and unsafe; expert said actual observation of interaction with parent was not pertinent to children over ages of six or seven, because older children have sufficient verbal capacity for interviews; termination of Mother's parental rights was in best interests of children; (3) termination statute does not require children to be placed in pre-adoptive home as precondition to termination of parental rights; and (4) affirming Orphans' court's order terminating Mother's parental rights). In cases where there is no evidence of any bond

---

**3.** Technically, Mother might have begun to comply with her FSP and ISP goals before the termination petition was filed, but Mother did not notify anyone of her efforts until well after the petition was filed.

between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case. *See In re E.M.,* *supra* (involving Mother who suffered from mental retardation and whose two children were similarly afflicted; Supreme Court held there was sufficient evidence to terminate Mother's parental rights under subsection (a), as programs designed to improve Mother's parental skills had failed, despite six years of intervention; but evidence of considerable bond between Mother and children foreclosed termination under subsection (b), absent consideration of that bond and what severing that bond would do to children, particularly where CYS' own expert witness said that bond had not been adequately studied; Supreme Court reasoned: "To render a decision that termination serves the needs and welfare of the child without consideration of emotional bonds, **in a case such as this** where a bond, to some extent at least, obviously exists **and where the expert for the party seeking termination indicates that the factor has not been adequately studied**, is not proper. Whether the bond exists to such a considerable extent that severing the natural parent-child relationship would be contrary to the needs and welfare of the children is an issue that must be more fully explored by the evidence") (emphasis added). *In re E.M.* is often cited for broader requirements than the case warrants. Nevertheless, the subsequent case law gives courts and agencies insight into what constitutes a proper subsection (b) examination.

¶ 13 In addition to a bond examination, the court can equally emphasize the **safety** needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent-child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

¶ 14 The dissent opines that the trial court's subsection (b) bond analysis is inadequate, given that Mother "had some bond with the child, whom she visited with regularly."[4] To the contrary, the trial court made clear it considered whether the bond between Mother and K.Z.S. was a necessary and beneficial relationship that could be severed without detrimental effects on K.Z.S. With regard to K.Z.S.' bond with Ms. Craig, whom he calls "Mommy," the Children's Choice caseworker testified that K.Z.S. feels secure only when he knows he is going home with Ms. Craig after visits with Mother. K.Z.S. has been in a stable family environment with Ms. Craig, to whom he looks for safety and security. His needs are met, and he knows no other home. Removal of K.Z.S. from Ms. Craig's home would destroy the only continuity K.Z.S. has had in his short life. Even the fear of removal obviously creates distress for K.Z.S. Ample unrefuted testi-

4. The record does not support the dissent's view regarding "regular visitation," where Mother consistently and without explanation missed 33 out of 53 scheduled visits, all of which were unexcused; and for over one year, from January 15, 2004 until March 1, 2005, Mother did not have any contact with the agency and did not give any reasons for why she was missing the visits. Mother's visits were scheduled for only twice per month. Therefore, if Mother missed over 62% of her visits, it can hardly be said that she visited regularly with K.Z.S.

mony indicated K.Z.S. is strongly bonded with foster mother and is thriving in the foster home.

¶ 15 Whatever relationship K.Z.S. has been able to build with Mother during their four years of almost constant separation must be fairly attenuated, given the circumstances of this case. Therefore, the existence of some bond with Mother does not necessarily defeat termination of her parental rights. The question becomes whether the bond between K.Z.S. and Mother is the one worth saving or whether it could be sacrificed without irreparable harm to K.Z.S. No evidence suggests that Mother has a strong bond with K.Z.S. equal to his bond with Ms. Craig, that terminating Mother's parental rights will sever an existing beneficial relationship, or that it will result in irreparable harm to K.Z.S. Therefore, we agree with the court that the bond between K.Z.S. and Ms. Craig is the primary bond to protect, given K.Z.S.' young age and his very limited contact with Mother. Because competent evidence of record supports the court's decision to terminate Mother's parental rights, we have no reason to disturb it. *See In re Adoption of K.J., supra.* Accordingly, we affirm.

¶ 16 Order affirmed.

¶ 17 *JUDGE KLEIN FILES A DISSENTING OPINION.

DISSENTING OPINION BY KLEIN, J.:

¶ 1 Under Pennsylvania law, when there is a demonstrated bond between Mother and child, as the parties acknowledge here, the *trial judge,* not this Court, has an obligation to discuss what effect termination of the bond would have on child. The trial court did not do that in this case, so I would remand for that analysis. Accordingly, I must dissent.

¶ 2 In this case, the majority correctly noted that because of her drug addiction, the trial court did not abuse its discretion by finding that Mother had demonstrated "a settled purpose to relinquish parental duties for at least the six months prior to the filing of the termination petition." *In re C.S.* 761 A.2d 1197, 1201 (Pa.Super.2000(en banc). When at birth both the Mother and child tested positive for cocaine, child was removed and placed with Tracy Craig, a family friend, where the child has remained to this date. Mother now lives in Baltimore in transition housing with three of her other children and, accordingly, missed a number of scheduled visits with K.Z.S. in Philadelphia. Despite the improvement in Mother's situation, the trial judge was within its discretion saying Mother demonstrated an abandonment of parental duties which would justify termination. However, the trial judge noted that there *have* been a number of visits of Mother with K.Z.S., and K.Z.S. has bonded both with Mother and the foster mother, Ms. Craig.

¶ 3 Under these circumstances, it is not enough that Mother's actions would justify termination. That is only one part of the required statutory termination analysis. Even if termination is justified under section 2511(a), it is the obligation of the trial judge to consider the needs and welfare of the child under section 2511(b). *In re C.P.,* 901 A.2d 516 (Pa.Super.2006). And, as the case law has made clear, a critical aspect of the needs and welfare analysis concerns the nature and status of the emotional bond *between natural parent and child,* with close attention paid to the effect on the child of permanently severing any such bond. In *In re Adoption of Atencio,* 539 Pa. 161, 650 A.2d 1064 (1994), our Supreme Court, stated: "[W]e have held that § 2511(b) of the Act requires the court to look to the effect of termination on

the needs and welfare of the child involved." *Id.* at 1067 (citing *In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993)); *see In re L.M.*, 923 A.2d 505 (Pa.Super.2007); *see also In re I.G.*, 939 A.2d 950 (Pa.Super.2007); *In re C.P.*, 901 A.2d 516 (Pa.Super.2006); *In re Adoption of R.J.S.*, 901 A.2d 502, 514 (Pa.Super.2006); *In re: D.W.*, 856 A.2d 1231, 1234 (Pa.Super.2004). Here, the trial judge neglected this analysis, focusing instead on the child's bond with the foster mother and the effect of severing the bond between the *foster mother* and the child.

¶ 4 In *In re E.M.*, 533 Pa. 115, 620 A.2d 481 (1993), our Supreme Court explained what a "needs and welfare" analysis requires. Reversing this Court, the Supreme Court stated:

> The Superior Court, in affirming the termination decree, expressly recognized that the question of the bond between appellant and the children had not been fully considered. Nevertheless, the Superior Court held,
>
> > [O]nce a parent is adjudged incompetent under section 2511(a) whereby family unity cannot be preserved, but where adoption is imminent, then there is no need to ascertain whether a beneficial bonding exists as between the natural parent and the children, nor whether additional factors counsel that continuing the relationship might otherwise serve the needs and welfare of the child.

*Id.* at 122–23, 620 A.2d 481. The Supreme Court disagreed, and stated:

> It is clearly conceivable that a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences. This is true regardless of whether adoption is imminent. *To render a decision that termination serves the needs and welfare of the child without consideration of emotional bonds, in a case such as this where a bond, to some extent at least, obviously exists and where the expert witness for the party seeking termination indicates that the factor has not been adequately studied, is not proper. Whether the bond exists to such a considerable extent that severing the natural parent-child relationship would be contrary to the needs and welfare of the children is an issue that must be more fully explored by the evidence.*

*Id.* at 123, 620 A.2d 481 (emphasis added); *see also In re: I.G., supra; In re: L.M., supra; In re Adoption of R.J.S., supra; In re: D.W., supra.*

¶ 5 Here, the trial judge discussed the effect of terminating the bond with *foster mother*, not Mother. It is undisputed that Mother *had some* bond with the child, whom she did visit regularly. The trial judge noted that the bonding evaluation done by the psychologist stated that K.Z.S. is bonded with the foster mother, Mrs. Craig, and with Mother. As noted, instead of discussing the effect severing the bond with *Mother* would have on the child, who is now almost five years old, the trial judge considered the effect on the child of severing the bond with Mrs. Craig, the *foster mother*. The trial judge found that *placing* the child with Mother would not be in the best interests of the child, nor would severing the bond with *Mrs. Craig.* That is not the issue. The child could stay with Mrs. Craig; nobody is talking about *placing* the child with Mother at this point. Under Pennsylvania law, once Mother's rights are terminated, the adoptive or potentially adoptive parent could prevent Mother from visiting her biological child; this highlights the significance of the trial court's consideration of the effect terminating the *Mother*/child bond would have on the child.

¶ 6 The trial court's section 2511(b) analysis consisted of two sentences:

> The Court based its finding on the testimony at trial that [K.Z.S.] has been placed with Ms. Craig for the last four years, she has been able to provide for [K.Z.S.s'] daily needs, and that [K.Z.S.] recognizes Ms. Craig as his Mommy and has expressed a desire to remain with Ms. Craig. Although the bonding evaluation done by the psychologist stated that [K.Z.S.] is bonded with both Ms. Craig and Mother, the Court found that to place [K.Z.S.] with Mother would only have a negative impact on [K.Z.S.]and would not be in the best interest of [K.Z.S.].

By no means is this a full exploration of what effect termination of the parent/child bond would have on K.Z.S. *E.M., supra.* The fact that K.Z.S. has bonded with his foster parent does not replace the trial court's required inquiry and assessment of any bond between natural parent and child. To acknowledge a bond between natural parent and child (Trial Court Op. at 4), without considering the effect of termination on the child, not only ignores the critical inquiry, but seriously depreciates the magnitude of a child's relationship with his biological parent. *See In re E.D.M.,* 550 Pa. 595, 708 A.2d 88 (1998). This is particularly so in a case like this, where the psychologists concluded in the bonding assessment that the child is bonded to *both* Mother and foster mother.

¶ 7 Moreover, the Majority does the trial judge's job here, analyzing the record and concluding that severing the bond between Mother and child would *not* have a deleterious effect on the child. (Majority, at 763–64). Again, that is not *this* Court's function. This Court is a reviewing court; we did not see and hear the witnesses and we cannot make that determination in the first instance. Further, the majority surmises that "[w]hatever relationship K.Z.S. has been able to build with Mother during their four years of almost constant separation must be fairly attenuated," (*Id.* at 764). This may be true, but in my opinion, based on my review of the record, this is unsupported. Neither the trial court nor the psychologists characterized the bond as "attenuated," and, in fact, and at the risk of being redundant, I point out that the purpose of the bonding evaluation was to determine who the child was *more* bonded with. The conclusion reached by both psychologists was that K.Z.S. was bonded with *both.*

¶ 8 While I do not disagree with the Majority's statement that the existence of some bond with Mother does not necessarily defeat termination of her parental rights, and I agree that the record *could* support a trial court determination that severing Mother's bond would not adversely affect the child, *the trial judge never considered that issue or made that finding. Cf. In re Adoption of Atencio, supra.* I would remand this case and instruct the trial judge to consider and articulate the effect that terminating *Mother's* bond with K.Z.S. would have on K.Z.S. in accordance with section 2511(b) and as explained by our Supreme Court. *See E.M., supra; see also Matter of Adoption of Charles E.D.M., II,* 550 Pa. 595, 708 A.2d 88 (1998) (where there was no evidence concerning effect termination of Mother's parental rights would have on children's well-being, Orphans' Court did not have competent evidence to make proper determination pursuant to Section 2511(b)).