J-S23017-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 706 EDA 2021 |

Appeal from the Order Entered March 25, 2021,
in the Court of Common Pleas of Philadelphia County,
Juvenile Division at No(s):  CP-51-AP-0000275-2019.

| | | |
|---|---|---|
| IN THE INTEREST OF: J.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 707 EDA 2021 |

Appeal from the Order Entered March 25, 2021,
in the Court of Common Pleas of Philadelphia County,
Juvenile Division at No(s):  CP-51-DP-0001660-2017.

BEFORE:   LAZARUS, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:          **FILED OCTOBER 1, 2021**

C.S. (Mother) appeals the order granting the petition filed by the

Philadelphia Department of Human Services (DHS) to involuntarily terminate

her rights to her four-year-old daughter, J.L.W. (Child), pursuant to the

_____

[*] Retired Senior Judge assigned to the Superior Court.

Adoption Act. *See* 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). After review, we affirm.[1,2]

The record discloses the relevant factual and procedural history: DHS became involved with Child's case in June 2017 after receiving a report that the family lived in a "hoarder house" with deplorable conditions.[3] Mother, Father, and Child were found wearing soiled clothing; and the home smelled of cat urine because the family owned nine cats, which apparently had also caused a flea infestation. There were also allegations that Mother had mental health issues, and that the parents abused drugs - though they were in a methadone treatment program. Child was removed from the home and ultimately adjudicated dependent in July 2017.

The dependency court placed Child in the care of M.M. (Foster Mother). The court ordered Mother to achieve certain goals to aid with reunification. The goals were: to secure safe and appropriate housing and demonstrate the ability to maintain appropriate living conditions; to establish herself as the

---

[1] N.W. (Father) voluntarily relinquished his parental rights.

[2] Although Mother appealed from both the termination docket and the dependency docket, she only challenges the court's decision to terminate her rights. She does not challenge the court's decision to change to goal of the dependency proceedings from reunification to adoption. Given our disposition of the termination appeal, any appeal from the dependency docket would have been moot in either event.

[3] DHS had previously been involved with Mother in June 2014, when she tested positive for benzodiazepines and methadone during the birth of Child's sibling. The court terminated Mother's parental rights regarding this sibling in December 2016.

payee of her Social Security Benefit in order to control her own finances; to attend and comply with substance abuse treatment and provide drug screens; to attend visitations with Child; and to attend and fully comply with mental health treatment.

By June 2018, Mother had moderately complied with the reunification plan, and the court allowed Mother to exercise an unsupervised visit with Child each week, in addition to her two supervised visits. However, Mother had yet to obtain appropriate housing, notwithstanding the supports DHS put in place. And she had yet to take the necessary steps to designate herself as the payee of her SSD benefit. In July 2018, Psychologist Erica Williams completed a parenting capacity evaluation of Mother. Dr. Williams concluded that Mother did not demonstrate the capacity to provide safety and permanency to Child. Dr. Williams recommended Mother obtain and maintain appropriate housing; develop and implement a sustainable financial plan; and participate in substance abuse treatment and mental health treatment.

Mother's compliance remained moderate throughout 2018 and into 2019, but reunification was still inappropriate due to Mother's inability to ensure Child could live in safe housing. In April 2019, DHS filed petitions to terminate Mother's rights and change the goal of the dependency proceedings from reunification to adoption. The court conducted a termination hearing over the course of three dates: November 1, 2019; September 14, 2020; and

March 25, 2021.[4]  The court ultimately granted the petition filed by DHS and terminated Mother's rights.  Mother timely filed this appeal, wherein she presents two issues for our review:

> 1. Whether the trial court committed reversible error, when it involuntarily terminated Mother's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), (5), and (8).
>
> 2. Whether the trial court committed reversible error when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of [Child] as required by the Adoption Act, 23 Pa.C.S.A. § 2511(b).

Mother's Brief at 8.

We review these issues mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because

_____

[4] At the conclusion of testimony on November 1, 2019, it was apparent that the court would need to schedule another day to complete the hearing.  With the onset of the Covid-19 Pandemic and the judicial emergency it created, the next hearing date did not occur until September 14, 2020.  However, upon the receipt of that September transcript, the trial court realized the transcription was inaccurate and that the testifying witnesses were misidentified.  The court then held a third day of testimony, on March 25, 2021, in order to recreate the record from September 14, 2020.  *See* Trial Court Opinion, 5/3/21, at n.1.

the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Instantly, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b).[5] We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Moreover, we may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201(Pa. Super. 2000) (*en banc*).

---

[5] The trial court denied the request of DHS to terminate Mother's rights under Section 2511(a)(1).

Mother's first appellate issue corresponds with the specific grounds for termination under Section 2511(a). Her second appellate issue concerns the second element of the bifurcated termination analysis under Section 2511(b). We begin our discussion with a review of the first prong of the termination analysis under Section 2511(a). As we need only to agree with the trial court as to one subsection of Section 2511(a), we analyze whether DHS properly established grounds under Section 2511(a)(2). That section provides in relevant part:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re C.M.K.***, 203 A.3d 258, 262 (Pa. Super. 2019) (citation omitted). The grounds for termination are not limited to affirmative misconduct, but concern

parental incapacity that cannot be remedied. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *Id*.

Here, Mother essentially concedes DHS established the first two steps of the Section 2511(a)(2) analysis. She argues the trial court erred because there was no evidence of her present incapacity. *See* Mother's Brief at 15. She explains she had completed most of her reunification goals, and that her housing goal was the only outstanding task. She contends further that she had established a bank account and was actively accruing savings to secure appropriate housing. *See id.*

However, the court determined that Mother's inability to make progress on this housing goal was indicative of her inability to parent. Notably, Mother's failure to provide safe housing was what caused of Child's removal in the first place. Throughout the dependency case, Mother had made progress on other fronts, but never on her housing goal. At the termination hearing, DHS elicited testimony from Dr. Williams, who explained why Mother's lack of progress was problematic:

> DHS: If you were to learn there were no changes in the condition of the home, why would you be concerned?
>
> Dr. Williams: It ends up being two-fold. So the original concern that [Child] was not safe but also now given DHS involvement, [Agency] involvement, intervention, awareness of the problem, if this problem remains static since the time that they became involved, which I believe [Child] was removed over two years

> ago at this point, it would be a concern that even with additional support the problem wasn't remedied.

N.T., 11/1/19, at 15

When Mother's rights were ultimately terminated nearly a year and a half after this testimony, in March 2021, Mother had yet to make progress. She had allegedly been on a cusp of securing new housing multiple times during the case, but to no avail. For instance, Mother went to a shelter, but did not remain beyond the intake meeting after learning that she would not be permitted to take nail clippers and a crochet needle. *See* N.T., 3/25/21, at 14-15. Instead, Mother chose to remain in the home from which Child was removed. This home was owned by the paternal grandfather, but Mother indicated that he would not let her clean up the home even though she paid rent. Mother also refused to allow DHS caseworkers from seeing the state of the home, explaining to them that the condition had not changed. Despite the multitude of supports put in place, Mother had taken no steps to remedy the principal reason for Child's removal – ensuring that Child would be able to live in a safe and secure dwelling.

Importantly – and contrary to Mother's position on appeal – the trial court's decision was not based entirely on the lack of housing. For instance, it was unclear whether Mother had sole control of her finances. Although Mother eventually designated herself as the payee of her SSD benefit, at the time of the termination hearing, another individual besides Mother had access to Mother's bank account. Thus, it was far from certain that Mother had taken

the necessary steps to plan for Child's financial care, nor could it be said that Mother was actively accruing funds to find new housing.

The trial court's concerns did not stop there. The court also had outstanding questions about Mother's sobriety and her ability to address her mental health. While Mother's negative screens suggested that she maintained her sobriety – at least through the first day of the termination hearing in November 2019 – DHS and the Foster Mother shared apprehensions that Mother was still using illicit drugs. In one instance, during a virtual visit with Child in August 2020, Mother's speech was slurred, she seemed to fall asleep on the call, and she was unresponsive to efforts trying to wake her. Foster Mother testified that she thought Mother was under the influence of drugs. The trial court found this testimony from the Foster Mother to be credible, considering her background as a nurse who worked with individuals struggling with addiction.

Moreover, the court was not satisfied that Mother had accomplished her mental health objective. Mother had a history of childhood trauma, a diagnosis for bipolar disorder, and a history of suicide attempts. Dr. Williams testified that, without mental health treatment, Mother could not be a stable parent. *See* N.T., 11/1/19, at 23-24. While Mother partook in some mental health treatment relating to anxiety and depression, Dr. Williams was concerned that this treatment did not touch upon Mother's specific needs – Dr. Williams explained that Mother needed to address her own trauma and Post-Traumatic Stress Disorder. The concern was that the treatment Mother

did receive was insufficient to help Mother remedy her parental incapacity. Even then, it was unclear whether Mother consistently participated in the treatment that she was receiving. *Id.* at 22-23.

Given the totality of these circumstances, the trial court determined Mother's parental incapacity persisted, and that she would not or could not remedy the same. Thus, the court found DHS established grounds to terminate Mother's rights under Section 2511(a)(2). We conclude the record supports that decision.

It was not the case that Mother had merely left some minor reunification objectives unfulfilled while addressing the root cause of Child's removal. In fact, the opposite appears true. While Mother complied with certain aspects of her reunification plan, the court determined Mother could not, or would not, address the underlying causes of Child's removal. This determination was not manifestly unreasonable; thus we discern no abuse of discretion. Because we agree with the court's decision under Section 2511(a)(2), we need not address Mother's appeal insofar as it relates to the other Section 2511(a) grounds for termination. *See In re B.L.W.*, 843 A.2d at 384.

Having established the first prong of the termination analysis, we turn now to the second. In her second appellate issue, Mother argues the trial court abused its discretion when it found that termination best served Child's needs and welfare. Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare

of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(b).

This Court has explained that:

[S]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.,* 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Concerning the bond, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship. *See C.M.K.*, 203 A.2d at 264 (citation omitted); *see also K.Z.S.*, 946 A.2d at 764 (holding there was no bond worth preserving where the child had been in foster care for most of the child's life, which caused the resulting

bond to be too attenuated).  We add, the court is not required to use expert testimony to resolve the bond analysis but may rely on the testimony of social workers and caseworkers.  **In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010).  Finally, we emphasize that "[w]hile a parent's emotional bond with her and/or her child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child."  **In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

In her second appellate issue, Mother argues DHS "failed to produce evidence that a bond does not exist" between Mother and Child. **See** Mother's Brief at 17.  Mother also cites the testimony of the case manager, who described the happy relationship between Mother and Child as a bond. **See id.** at 17-18 (citing N.T., 3/25/21, at 31).  Mother concludes this meant the bond was substantial and worth preserving. **Id.** at 18.

However, trial court found that the relationship between Mother and Child, though loving, was more akin to a sibling relationship than a parental one.  A typical visit was more like a play date, than anything else.  The court heard testimony that, while Child enjoyed playing and visiting with Mother, Child clearly viewed Foster Mother as her source of parental support.  For that reason, the court determined that Child would not suffer irreparable harm from the termination of Mother's rights.  After all, by the time the court terminated Mother's rights, Child had lived with Foster Mother for approximately three and a half of her four years.

Upon review, we first note that the petitioner in termination cases need not produce evidence suggesting the absence of a parental bond, as Mother argues. Insofar as the parental bond is analyzed under Section 2511(b), we are mindful that bonds are not always worth preserving. ***See K.Z.S.***, 946 A.2d at 764. And if there is no evidence of a bond between the parent and child, it is reasonable to infer that none exists. ***Id.*** at 762-63. Here, to the extent that Child has a well-adjusted relationship with Mother, the same is the result of Foster Mother's parental care. Although Mother is appropriate with Child, and although Child is content to play with Mother, this must not be conflated with the sort of worthwhile, parental bond contemplated by our case law. Semantics aside, even if Mother and Child shared a "parental" bond, the record supports the trial court's conclusion that the bond was not worth preserving. Foster Mother is the only parent Child has ever truly known. She is the source of Child's emotional support and security. And thus the court did not err when it determined that termination of Mother's rights would best serve Child, pursuant to Section 2511(b).

In sum, we conclude the record supports termination under Section 2511(a)(2) and (b). The court did not err or otherwise abuse its discretion when it determined that Mother could not remedy the incapacity which led to Child's removal, pursuant to Section 2511(a)(2). As such, we need not address the trial court's findings under Section 2511(a)(5) and (8). We also conclude the court did not err or otherwise abuse its discretion when it found no bond was worth preserving under Section 2511(b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/1/2021