J-S61045-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| IN RE: N.W., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.P., NATURAL MOTHER | : | No. 1094 WDA 2014 |

Appeal from the Order April 25, 2014
in the Court of Common Pleas of Allegheny County,
Orphans' Court, at No(s): TPR 205 of 2013

BEFORE:    FORD ELLIOTT, P.J.E., WECHT, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:                    **FILED OCTOBER 14, 2014**

D.P. (Mother) appeals from the order of April 25, 2014, which terminated her parental rights to her daughter, N.W.  We affirm.

The trial court summarized the history of the case as follows.

N.W. (minor child) first came in to the care of Allegheny County Children, Youth, and Families (CYF) on April 30, 2012. N.W. was born [in December 2011].  At that time, Mother and N.W. were living with Mother's paternal grandmother.  Mother, a minor, was dependent and in the foster care of her paternal grandmother, but N.W. was not dependent at this time.

Subsequently, Mother left the care of her paternal grandmother and went with N.W. to live with other foster parents.  However, Mother later left the dwelling of the foster parents, leaving N.W. behind in the foster home.  After a shelter hearing on May 2, 2012, N.W. was adjudicated dependent due to Mother's failure to care for the child, her runaway status, and the fact the Mother, a dependent child herself, was not following the recommendations of CYF.  It was ordered that N.W. remain in the foster home.  It is these foster parents who are currently seeking to adopt N.W.

On December 20, 2013, CYF filed a Petition for Involuntary Termination of Parental Rights (TPR) against Mother, Father, and

*Retired Senior Judge assigned to the Superior Court.

the Unknown Father of N.W. CYF filed the petition for termination with respect to Mother under 23 Pa.C.S. § 2511(a)(2), (5), and (8).

Trial Court Opinion, 7/9/2014, at 1-2.

The trial court held a hearing on the petition on April 7, 2014, at which the court heard the testimony of a CYF caseworker, a psychologist who had evaluated Mother and Child, an in-home service provider, and Mother. Following the hearing, the trial court entered orders terminating all putative parents' parental rights under subsections (a)(8) and (b). Mother timely filed a notice of appeal and statement of errors complained of on appeal. The trial court filed its opinion on July 9, 2014.

Mother presents the following questions on appeal.

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511 (a)(8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 5 (trial court answers omitted; citation format modified).

We consider Mother's questions mindful of the following.

In cases involving the termination of a parent's rights, our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child.

Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand…. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re C.W.U., Jr.*, 33 A.3d 1, 4 (Pa. Super. 2011) (internal quotations and citations omitted).

Our courts apply a two-part analysis in considering termination of parental rights. As we explained in *In re L.M.*, 923 A.2d 505 (Pa. Super. 2007),

[i]nitially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* at 511.

The governing statute provides as follows, in relevant part.

**(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date

- 3 -

of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a) … (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

Section 2511(a)(8) represents the determination that "a parent's basic constitutional right to the custody and rearing of his … child is converted, upon the failure to fulfill … parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In the Interest of K.Z.S.*, 946 A.2d 753, 759-60 (Pa. Super. 2008) (quoting *In re B.N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004)).

There is no dispute that N.W. had been out of Mother's care well over 12 months at the time CYF filed its petition. Mother argues, however, that "the conditions which led to the removal of the child do not continue to exist." Mother's Brief at 15. Further, Mother claims that CYF did not offer

sufficient proof that termination of Mother's parental rights would best serve the needs and welfare of N.W. *Id.*

The trial court summarized the witnesses' testimony as follows.

At the April 7, 2014 termination hearing, CYF Caseworker Herb Bairhalter testified to the timeline of the case after N.W.'s dependency adjudication. Mother remained a runaway, her whereabouts unknown, until August 2012. Mother then was placed in a group home, Keystone Adolescence Center, for a month, and subsequently, from September 2012 until May 2013, Mother was placed in another foster home. Mother then returned to the foster home of the couple that currently wishes to adopt N.W. in May 2013, where Mother had her second child. In August of 2013, Mother again left this foster home, while N.W. and Mother's newborn son remained there. Meanwhile, since April 2012, N.W. has remained with the foster parents who are currently seeking to adopt her.

Mr. Bairhalter also testified to the history of the case in terms of the goals of the Family Service Plan (FSP) that Mother was required to fulfill in order to potentially be reunited with her daughter. Besides abandonment, additional concerns that were raised throughout the duration of the case which caused the child to remain in care included drug and alcohol concerns, parenting issues, general instability, and refusing to cooperate with agency services. Mother's initial FSP goals included the following: to meet basic financial demands of daily living, to achieve and maintain recovery from substance abuse, to attend and perform well in school, to eliminate verbal and physical family abuse, and to maintain contact and cooperation with the Agency and service providers. There were also a number of goals conditioned on Mother having custody, and thus did not apply to Mother. Additional FSP goals included maintaining a relationship with the children through regular visitation, stabilizing mental health, and improving the relationship through parenting classes.

In terms of the first goal of meeting and maintaining basic financial demands, this goal was not completed as of the date of the filing of the TPR on December 20, 2013. Mother only recently obtained employment at a fast food restaurant,

subsequent to the filing of the TPR petition. As to the second goal, achieving and maintaining recovery from substance abuse, even though Mother's most recent drug screens were negative, as of the December 20, 2013 date, the Agency did not consider Mother to be in compliance with her drug screens. Out of the fifteen scheduled drug screens as of the TPR filing date, Mother only showed to five, and thus this goal was incomplete. As to her schooling, Mother has completed this goal by achieving her GED. Mother also completed the goal of eliminating verbal and physical family abuse. However, Mother did not complete her goal of maintaining contact and cooperation with the CYF, since as of the time of filing, there were periods of no contact and periods where it was difficult to reach her. Mother also did not complete the goal of regular visitation, as there were periods of missed visitation. As to stabilizing her mental health, Mother completed this goal. With respect to the parenting goal, although Mother did complete a parenting class, CYF continued to have concerns about Mother's ability to parent. These concerns primarily relate to the fact that Mother left her second child at the foster parents home in a similar manner to how she left N.W. behind.

Caseworker Bairhalter also testified to the CYF's overall view of Mother's progress throughout the history of the case. Although Mother had improved recently, Mr. Bairhalter explained how her behavior has been inconsistent, and that there have been periods where she has been "out of control." Mr. Bairhalter also testified as to Mother's stability, noting that if N.W. returned to Mother today, CYF did not believe she could provide adequate care and a stable environment. Caseworker Bairhalter testified that the conditions that led to N.W.'s removal continue to exist, and that the child has been in care for twelve months. He also noted that it has been almost two years since N.W. was cared for by Mother. Mr. Bairhalter also testified that termination of Mother's parental rights at this time would serve the child's needs and welfare. The child had been in the pre-adoptive home for almost two years at the time of the TPR hearing. Caseworker Bairhalter noted that N.W. and her foster parents interact well and that the child is with her brother in the foster home at this point in time.

Dr. Eric Bernstein, a licensed psychologist, testified to evaluations he conducted with Mother alone and with Mother,

her son, and N.W. In Mother's individual evaluation, dated December 2012, Dr. Bernstein learned about her past difficulty with drugs and alcohol. He ultimately encouraged her to attend a psychiatric evaluation to help her psychiatric instability. In Mother's individual evaluation dated January 2014, Dr. Bernstein diagnosed Mother with adjustment disorder with anxiety and depressed mood. Dr. Bernstein at this time acknowledged some improvements in her situation in terms of stability, but made note that she must continue working on this objective. He also noted some inconsistencies such as a report of her intoxication and a CYF report of heroin possession, both of which she had not acknowledged. In the interactional evaluation dated January 2014 between Mother and her children, Dr. Bernstein observed that while Mother did elicit affection from her daughter, she appeared to be focused upon challenging her daughter to show her knowledge. However, Mother showed her daughter attention and support and the child was obedient. Mother did have brief periods of impatience. Ultimately, Dr. Bernstein acknowledged that the bond between Mother and N.W. could not be classified as "strong" at this moment in time, due to [M]other's history of inconsistent involvement as a parental figure.

Dr. Bernstein also testified as to the February 2014 interaction[] between N.W., her brother, and the foster parents. He observed the foster parents working reasonably well together in attending to N.W. He did note, however, foster Father initially displaying some discomfort as to being forced to undergo such an evaluation. Yet foster Father made sure to inquire about N.W.'s activities, showed concern in terms of her needs, and used humor to connect with her. Dr. Bernstein also observed that N.W. responded to the foster parents well. He further noted in this evaluation that foster Mother was even more comfortable and assumed the primary role in attending to N.W. Dr. Bernstein observed the stable caretaking role the foster parents served, especially considering the fact that N.W. has been in their care for almost two years and that N.W. is at the developmental age where her level for attachment is dominant. He further specified in terms of stability that N.W. seems to depend upon the foster parents for all of her needs and the foster parents work together to make sure these needs are met. Thus, there is a strong bond between N.W. and the foster parents.

Dr. Bernstein then testified as to his recommendation in terms of termination, namely, that termination would indeed meet the needs and welfare of the child. He explained that if the foster parents relationship with N.W. were severed, this could potentially be very traumatic for N.W. due to their strong bond; he noted that this might have implications to her future relationships, self-esteem, behavior, or overall adjustment in the short and long run. On the other hand, Dr. Bernstein explained that termination of the bond between Mother and N.W. would likely not have a detrimental effect on the child. He described how children learn to experience a level of distrust or lack of dependability upon certain individuals, and instead gravitate towards individuals who are more consistent and can meet their needs regularly, such as the foster parents who he believes provide a structured, consistent schedule for N.W.

During Mother's testimony, Mother attested that she did not abandon her second child as she did N.W. According to Mother, foster Mother told her to leave the house. Mother also testified to the unsupervised visits and overnight visits she has had rather frequently with the children, with the permission of foster [mother] but against court orders. Mother also testified, upon [the trial court's] inquiry, that she was not currently pregnant; however, Lavina Harris of Holy Family Services confirmed that Mother was indeed pregnant.

Trial Court Opinion, 9/7/2014, at 2-6 (footnote omitted).

The trial court's factual determinations are supported by the record, and render meritless Mother's argument regarding the resolution of the conditions that led to placement. "Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement…." **K.Z.S.**, 946 A.2d at 759 (quoting **In re Adoption of K.J.**, 936 A.2d 1128, 1133 (Pa. Super. 2007)). Rather, the question is whether, after being given more than a year of time and assistance to remedy the conditions that led to

placement, Mother alleviated those conditions prior to the filing of the petition to terminate her rights.

Mother's success in achieving financial stability, in the form of one month of employment, occurred after CYF filed the petition, and may not be considered. *See* N.T., 4/7/2014, at 72; 23 Pa.C.S. § 2511(b). Further, prior to the filing of the TPR petition, Mother had not been consistent with her drug screens, N.T., 4/7/2014, at 72, and had not complied with her goals of contact and cooperation with CYF. *Id.* at 82. Although Mother testified that she can take full responsibility for N.W. immediately, the trial court was free to disbelieve her, and to find credible the opposing testimony that Mother is not ready to parent now, after not having done so in two years, and having in the interim left a second child in the care of foster parents. *See, e.g., id.* at 32 (Dr. Bernstein testifying "I still have concerns about … her continued progress and to what extent she will ultimately be in a position to meet [N.W.'s] needs on a full-time basis."); *id.* at 93 (Mr. Bairhalter testifying that Mother's leaving her second child in the foster parents' home caused CYF to question Mother's parenting ability despite her completion of a parenting class).

While Mother may have made substantial improvement in her life, and continued to progress after CYF filed its petition, she failed to improve enough to earn a recommendation of unsupervised visitation, let alone full custody of N.W. Contrary to her unsupported claim that subsection (a)(8)

allows that "twelve months may not be sufficient for parents to remedy the conditions which led to removal but eighteen months should be[,]" Mother's Brief at 17, the subsection is clear in setting a twelve-month deadline. As we have observed,

> application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her [child]. By allowing for termination when the conditions that led to removal of the child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re C.L.G.*, 956 A.2d 999, 1005 (Pa. Super. 2008) (*en banc*). Consequently, the trial court properly determined that CYF met its initial burden under subsection (a)(8).

Looking to the second requirement of subsection 2511(a)(8), the record supports the trial court's finding that terminating Mother's parental rights best serves the needs and welfare of N.W. Specifically, Dr. Bernstein testified that N.W. looks to her foster parents, rather than Mother, for all of her needs; foster parents are meeting those needs in providing a consistent and structured schedule for N.W.; and terminating N.W.'s relationship with her foster parents would cause trauma. N.T., 4/7/2014, at 30-32, 45-46. Accordingly, we conclude that the trial court did not err in finding that CYS met its burden under section 2511(a)(8). *See, e.g., In re C.L.G.*, 956 A.2d

at 1008 ("[I]f we were to permit Mother further opportunity to cultivate an environment where she can care for C.L.G., we would be subjecting a child, who has been waiting for more than two years for permanency, to a state of proverbial limbo in anticipation of a scenario that is speculative at best.").

We next consider whether the trial court gave adequate consideration to the welfare of N.W. under subsection 2511(b). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child." **K.Z.S.,** 946 A.2d at 760 (quoting **In re C.P.**, 901 A.2d 516, 520 (Pa. Super. 2006)).

> The court should also consider the importance of continuity of relationships to the child…. The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the needs and welfare of the child.

**Id.** (internal citations omitted).

Mother argues that the record shows that the trial court was not convinced that severing her bond with Mother is in N.W.'s best interests. In support, Mother points to the trial court's comments that it has concerns about foster mother and that it would not proceed with the adoption until after an adoption mediation and agreement. Mother's Brief at 20 (citing N.T., 4/25/2014, at 25, 28).

The trial court's comments are based upon its concerns about the foster mother's judgment, specifically the fact that she, contrary to court

- 11 -

order, had allowed Mother to have unsupervised, overnight custody of N.W. The issues with timing and propriety of foster mother's adoption of N.W. are separate and distinct from the question of the termination of Mother's parental rights under 23 Pa.C.S. § 2511(b).

The record supports the trial court's finding that N.W.'s needs and welfare would be served, and that no necessary or beneficial relationship would be destroyed, by terminating Mother's rights. *See*, *e.g.*, N.T., 4/7/2014, at 33 (Dr. Bernstein testifying that N.W. will not suffer any detrimental effects from the severing of her bond with Mother). Thus, the evidence was sufficient to show that terminating Mother's parental rights, freeing N.W. to be adopted, would best serve her needs and welfare. *See, e.g., L.M.,* 923 A.2d at 512 ("There was absolutely no evidence that severing the ties between Mother and L.M. would have a negative effect on the child. Rather, unrefuted testimony indicated that L.M. was strongly bonded to her foster mother and was thriving in her foster home.").

Therefore, because the record supports the trial court's conclusions (1) that the conditions that led to N.W.'s placement continue to exist, and (2) that termination of Mother's parental rights is in N.W.'s best interests, we hold that the trial court committed no error or abuse of discretion in granting CYF's petition under subsections 2511(a)(8) and (b).

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/14/2014