J-S40031-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.S.W., A/K/A. D.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.L.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 498 EDA 2018 |

Appeal from the Order Entered January 16, 2018
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s):  CP-51-AP-0000893-2017,
CP-51-DP-0001361-2016, FID: 51-FN-385247-2009

| | | |
|---|---|---|
| IN THE INTEREST OF: N.C.W.-M, A/K/A N.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.L.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 504 EDA 2018 |

Appeal from the Order Entered January 16, 2018
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s):  CP-51-AP-0000894-2017,
CP-51-CP-0002707-2016, FID: 51-FN-385247-2009

| | | |
|---|---|---|
| IN THE INTEREST OF:: N.A.W., A/K/A. N.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.L.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 505 EDA 2018 |

J-S40031-18

Appeal from the Order Entered January 16, 2018
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s): CP-51-AP-0000654-2017,
CP-51-DP-0001692-2014, FID: 51-FN-385247-2009

| | | |
|---|---|---|
| IN THE INTEREST OF: D.E.M., A/K/A. D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.L.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 508 EDA 2018 |

Appeal from the Order Entered January 16, 2018
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s): CP-51-AP-0000655-2017,
CP-51-DP-0001693-2014, FID: 51-FN-385247-2009

BEFORE:   LAZARUS, J., DUBOW, J., and PLATT*, J.

MEMORANDUM BY LAZARUS, J.:                        Filed July 20, 2018

N.L.W. (Mother) appeals from the order, entered in the Court of Common Pleas of Philadelphia, terminating her parental rights to her minor children, N.A.W. (born 8/2008), D.E.M. (born 5/2012), D.S.W. (born 11/2015), and N.C.W.-M. (born 11/2016), pursuant to 23 Pa.C.S. §§

_____

*Retired Senior Judge assigned to the Superior Court.

- 2 -

2511(a)(1), (2), (5), (8),[1] and (b)[2] of the Adoption Act,[3] and changing the

goal to adoption.  After careful review, we affirm.[4]

_____

[1] Section 2511 provides, in pertinent part:

(a) **General rule** — The rights of a parent in regard to a child may be
terminated after a petition filed on any of the following grounds:

> (1)   The parent by conduct continuing for a period of at least six
> months immediately preceding the filing of the petition
> either has evidenced a settled purpose of relinquishing
> parental claim to a child or has refused or failed to perform
> parental duties.
>
> (2)   The repeated and continued incapacity, abuse, neglect or
> refusal of the parent has caused the child to be without
> essential parental care, control or subsistence necessary for
> his physical or mental well-being and the conditions and
> causes of the incapacity, abuse, neglect or refusal cannot or
> will not be remedied by the parent.
>
> * * *
>
> (5)   The child has been removed from the care of the parent by
> the court or under a voluntary agreement with an agency
> for a period of at least six months, the conditions which led
> to the removal or placement of the child continue to exist,
> the parent cannot or will not remedy those conditions within
> a reasonable period of time, the services or assistance
> reasonably available to the parent are not likely to remedy
> the conditions which led to the removal or placement of the
> child within a reasonable period of time and termination of
> the parental rights would best serve the needs and welfare
> of the child.
>
> * * *
>
> (8)   The child has been removed from the care of the parent by
> the court or under a voluntary agreement with an agency,
> 12 months or more have elapsed from the date of removal
> or placement, the conditions which led to the removal or

The Department of Human Services (DHS) first became aware of issues concerning two of the minor children on March 29, 2014,[5] when DHS received a general protective services report that alleged Mother was neglecting the needs of N.A.W. and D.E.M. The report stated the two children were dirty and unkempt, that they asked for food and money from the neighbors daily, and that Mother employed physical punishment. DHS validated this report. On April 22, 2014, DHS implemented in-home protective services through Youth

_____

> placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8).

[2] Section 2511(b) provides:

> **(b) Other considerations** — The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. **With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.**

23 Pa.C.S. § 2511(b) (emphasis added).

[3] 23 Pa.C.S. §§ 2101-2910.

[4] We note that E.M.'s (Father) parental rights were involuntarily terminated on January 16, 2018; he is not a party to this appeal.

[5] Neither D.S.W. nor N.C.W.-M. had been born yet.

Services, Inc., whereby N.A.W. was scheduled to be evaluated by DHS to determine if she was in need of services, and D.E.M. was scheduled to be evaluated for ChildLink services. Mother failed to make the children available for these evaluations.

On July 15, 2014, DHS visited the home and found it lacked electricity and gas; DHS also learned the children's maternal grandmother slept on the twin bed provided by in-home protective services. D.E.M. thus lacked a proper sleeping arrangement. Upon a follow-up visit to the home the next day, DHS found the utilities remained disconnected, despite Mother stating the services would be turned back on by then. Because Father reported his residence lacked water service, he stated he could not care for the two children. On July 16, 2014, DHS obtained an order of protective custody and placed N.A.W. and D.E.M. in foster care. Following a hearing, which Mother attended, the court adjudicated both children dependent. Mother was referred to the Achieving Reunification Center (ARC) and ordered to attend weekly supervised visits at the agency with the children.

After this initial adjudication of dependency, Mother was ultimately reunited with N.A.W. and D.E.M. After their reunification, the family remained under DHS supervision.

On February 17, 2016, Community Umbrella Agency Turning Points for Children (CUA) created a single case plan for the family. The objectives for Mother were to stabilize the children's medical needs, provide appropriate supervision for the children at all times, stabilize housing, ensure the children

attended school and their specialized services, stabilize N.A.W.'s mental health, and meet the children's basic needs concerning food and clothing. Subsequently, while under court supervision, Mother became non-compliant with her objectives and the agency's recommendations. Mother's housing was deemed unstable and she stopped tending to the children's needs.

In April of 2016, five months after D.S.W. was born, the family came under investigation again because of reports that the children were unkempt and asking strangers for food and money at the corner store. The report further alleged that Mother punched her child, who was then five years old, cursed at her children, and demanded that one of her children go down into a construction hole to retrieve something that Mother had dropped into it. DHS validated this report.

On June 28, 2016, Mother attended a permanency review hearing. The court found it was not safe for the three children to remain in the home with Mother and ordered police assistance to remove the children. Mother was referred to parenting classes, including family school, and to DHS for an evaluation.

On July 1, 2016, DHS visited Mother's home and found the home to be inappropriate and in deplorable condition. The home was filthy, containing visible trash and raw sewage. The basement was inaccessible due to piles of trash blocking the doorway. There was no working toilet in the home. DHS

thus obtained an order for protective care for N.A.W., D.E.M, and D.S.W.,[6] and the children were placed in foster care.

From her intake in March 2016 to July 2016, Mother attended three out of twenty-six scheduled appointments at family school. In June 2016, Mother received thirty days' notice that she would be discharged if her attendance did not improve. On July 8, 2016, Mother was discharged from family school due to her poor attendance.

Mother's single case plan was revised on September 8, 2016. Mother's new objectives were to attend medical appointments for the children, obtain adequate housing with working utilities, maintain a relationship with the children through court-ordered visitation, complete parenting classes, stabilize her own mental health by participating in therapy, and cooperate with CUA services by maintaining contact with the agency. At a permanency review hearing later that month, Mother was referred to DHS for an evaluation, a parenting capacity evaluation, and ARC for appropriate services. Further, she was granted weekly supervised visits with the children at DHS with the possibility that visits would be further modified to bi-weekly, then monthly if she remained non-compliant during her visits. Mother gave birth to N.C.W.-M. on November 10, 2016.

---

[6] N.C.W.-M. had not yet been born.

Mother's single case plan was again revised on December 2, 2016, with essentially the same objectives.[7] N.C.W.-M. was adjudicated dependent and placed in foster care on December 13, 2016. In March of 2017, DHS received information that Mother failed to consistently attend her mental health appointments. From October 6, 2016 to March 13, 2017, Mother only attended five out of sixteen scheduled appointments with Community Council. DHS ultimately determined that it was necessary to seek termination of Mother's parental rights, and it filed a petition on June 19, 2017 to change the goal to adoption for the four minor children. Mother ultimately enrolled at a different mental health program in November of 2017, two months before her scheduled termination hearing. N.T. Hearing, 1/18/18, at 44-47, 54.

A termination and goal change hearing was held on January 16, 2018. Mother's DHS supervisor testified as to Mother's lack of compliance with mental health treatment, her poor attendance and subsequent dismissal from family school, and her struggles in supervised visits with her children. The supervisor reported Mother "struggle[d] to keep control" of her children and did not keep a "careful watch" over them during visitation. DHS workers also reported that Mother spent more time with staff than with her own children. Further, she did not consistently attend her children's medical appointments. *Id.* at 51, 56-57, 61. Mother's housing situation also continued to raise concerns for DHS. Mother on various occasions lied to her social workers

---

[7] The only addition being the objective to learn and understand age appropriate behavior and expectations for her children.

about where she resided. While telling her caseworkers that she moved to a suitable home, Mother continued to live at the initial home that contained raw sewage, trash, and structural hazards.

Given the agency's concerns about Mother's parenting, DHS referred her to a forensic psychologist for a parental-capacity evaluation. The psychologist who performed the evaluation testified at the termination hearing, concluding that Mother "did not present with the capacity to provide safety [or] permanence to her children." *Id.* at 20. She based this conclusion on Mother's failure to meet the children's needs despite "substantial intervention" from DHS and social workers; Mother's failure to acknowledge any problems with her parenting, which made her resistant to suggestions to improve her parenting; and Mother's lack of a plan for how she would financially meet her children's needs. *Id.* at 21-27.

Mother also testified at the hearing. She claimed that her social workers initially did not allow her to attend her children's medical appointments and then did not help her facilitate her attendance at those appointments. Mother also acknowledged she did not engage with N.A.W. at visits, but stated the child preferred using a cell phone or tablet to interacting with her. Mother also stated that she had resumed mental health treatment.

At the time of the termination hearing, N.A.W., D.E.M., and D.S.W. had been in DHS' custody since July 1, 2016, and N.C.W.-M. had been in custody since December 13, 2016. As the DHS supervisor testified, in each case the foster parents met the children's needs. The children developed strong bonds

to their foster parents. For the younger two children, the foster parents were the parents they knew since infancy.

After considering the evidence before it, the trial court terminated Mother's parental rights under sections 2511(a)(1), (2), (5), and (8). The court subsequently found that termination best served the needs and welfare of the children under section 2511(b). Mother filed four timely notices of appeal, one for each child. Each of Mother's Rule 1925(b) statement of errors complained of on appeal included the same errors. On appeal, Mother presents the following issues for our review:

1. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Mother], N.W., under 23 Pa.C.S.A. § 2511(a)(1)?

2. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Mother], N.W., under 23 Pa.C.S. § 2511(a)(2)?

3. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Mother], N.W., under 23 Pa.C.S. § 2511(a)(5)?

4. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Mother], N.W., under 23 Pa.C.S. § 2511(a)(8)?

5. Whether the [t]rial [c]ourt erred by terminating the parental rights of [Mother], N.W., under 23 Pa.C.S. § 2511(b)?

Appellant's Brief, at 5-6.

Mother argues the trial court was not presented with clear and convincing evidence to terminate her parental rights because Mother "was attending a mental health program at [a new facility], attended her visits,

completed parenting [classes], has appropriate housing at her father's residence[,] and wanted to attend the children's medical appointments." Appellant's Brief, at 12.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. [T]here are clear reasons for applying an abuse of discretion standard of review in these cases. . . . [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (citations omitted; some formatting added). We must employ a broad, comprehensive review of

the record in order to determine whether the trial court's decision is supported by competent evidence. *In re C.S.*, 761 A.2d 1197, 1199 (Pa. Super. 2000).

Here, the court terminated Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), and (8). However, parental rights may be involuntarily terminated where any one subsection of section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions. *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citations omitted); *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (when trial court relies upon more than one statutory basis under subsection 2511(a) for termination of parental rights, we will affirm if we agree with any one basis asserted by trial court). Specifically, this Court has held that termination of parental rights under section 2511(a)(8) requires a showing that: "(1) the child[ren] [have] been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child[ren] continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child[ren]." *In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008).

Mother's children had been removed from her custody for more than twelve months at the time of her termination hearing. At the time of the hearing, N.A.W., D.E.M., and D.S.W. had been in DHS custody since July 1, 2016 (eighteen months); N.C.W.-M. had been in custody since December 13, 2016 (thirteen months). Once the twelve-month period has been established, the court must examine whether the conditions that led to the children's

- 12 -

removal persist, despite the "reasonable good faith efforts of DHS supplied over a realistic time period." **Id.**

DHS presented clear and convincing evidence that "the conditions which led to the removal . . . of the child[ren] continue[d] to exist and termination of parental rights [] best served[d] the needs and welfare of the child[ren]." 23 Pa.C.S. § 2511(a)(8). The conditions that warranted removal of the children from Mother's custody included the unhygienic state of her residence, Mother's failure to meet her children's basic and medical needs, and Mother's haphazard parenting. In January of 2018, all of these conditions had persisted for almost two years. Mother had a single case plan when the children were removed from her home. This plan continued to be updated when Mother consistently failed to comply with her given objectives. Not only did Mother not comply with that plan by declining to attend court-ordered and DHS-recommended classes and mental health treatment, but she also lied to DHS caseworkers about what home she kept as her permanent residence. Further, the court found that termination of Mother's parental rights would not negatively impact the children, because of the strong bonds they had developed with their foster parents, and termination was in all of the children's best interest.

Mother's response on appeal is merely that she complied with some of her single care plan objectives. She fails to address the reasons the children came into care in the first place. Further, though Mother argues that she now has suitable housing, as per the Adoption Act, this Court "shall not consider

any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." *See* 23 Pa.C.S. § 2511(b).

Once a court has established that termination is permissible under section 2511(a)(8), it must then consider the "developmental, physical and emotional needs and welfare of the child." *Id.* In its considerations, a trial court must also "discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *In re K.Z.S.*, *supra*, at 760. The testimony before the trial court established the strong bonds between the children and their foster parents, while demonstrating the lack of bond between Mother and the children. As the younger two children were placed in foster care in infancy, their foster parents were the only parents they knew. Due to these strong relationships, the children would not suffer irreparable harm if Mother's parental rights were terminated.

Mother argues she attempted to bond with her children, and called DHS multiple times to attend their medical appointments. The trial court found Mother's claims that she called DHS multiple times without answer were incredible. Regardless, the question under section 2511(b) is not the attempt to establish bonds with the children, but rather the strength of the existing parental bond. *Id.* Here, the evidence did not support a finding that Mother shared a necessary, beneficial parent-child bond with any of her children.

The court's findings are supported in the record. ***Adoption of S.P.***, ***supra***. We conclude, therefore, that the court properly terminated Mother's parental rights under sections 2511(a)(8) and (b).

Order affirmed.

Judge Platt joins the Memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/20/2018