J-A18013-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ADOPTION OF: N.K. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: B.K. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 177 WDA 2023 |

Appeal from the Decree Entered November 14, 2022
In the Court of Common Pleas of Indiana County Orphans' Court at
No(s): 32-22-0496

BEFORE: BENDER, P.J.E., LAZARUS, J., and KUNSELMAN, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED: OCTOBER 19, 2023**

Appellant, B.K. ("Natural Father"), appeals from the orphans' court's November 14, 2022 decree terminating his parental rights to N.K. ("Child"), born in January of 2015. We affirm.

The orphans' court summarized the background of this case as follows:

### I.    Procedural History

On July 11, 2022, the Petitioners, [D.T.] ("Mother") and [B.T.] ("Stepfather" or "Proposed Adoptive Father") [(collectively "Petitioners")] filed a Petition for Involuntary Termination of the Parental Rights of [Natural Father]. This [c]ourt, by Order dated July 12, 2022, appointed … [c]ounsel for [N.K.] A hearing on the Petition was originally scheduled for September 7, 2022. At the September 7, 2022[] hearing[,] Natural Father was present and advised the [c]ourt that he opposes the Petition. The hearing was then continued[,] and this [c]ourt appointed … [c]ounsel for … Natural Father. A hearing was held on November 8, 2022, and all parties and their [c]ounsel were present. … Petitioners each testified and also presented testimony of [H.C.], Maternal Grandmother. Counsel for [N.K.] called no witnesses. Natural Father testified and presented to [*sic*] additional witnesses or evidence….

## II. **Factual Summary**

[D.T.] is the biological mother of [N.K]….   [B.T.] is Mother's husband, Stepfather to [N.K.], and the proposed adoptive father. … Respondent[] is [B.K.] and is [N.K.'s] biological father.  Mother and Natural Father were involved in a relationship that … resulted in the conception of [N.K].  Mother[,] having determined that she was pregnant[,] notified Natural Father.   Natural Father was incarcerated at the time [N.K.] was born.  Natural Father is listed on [N.K.'s] Birth Certificate.  Natural Father has been incarcerated for a "good part" of [N.K.'s] life.  As of the present day, based on the testimony of Natural Father, he is still on parole.

Due to addiction issues of Mother and Natural Father, [N.K.] resided with Maternal Grandmother from a date in 2015 until 2019.   Since 2019, [N.K.] has been in the custody of Mother. While [N.K.] resided with Maternal Grandmother, Mother would visit with [N.K.] as "much as possible."   Additionally, Natural Father moved in with Maternal Grandmother and [N.K.] in September 2016, where he resided until December 2016. Maternal Grandmother testified that[,] after Natural Father moved out, he did not request any contact with [N.K].  She further testified that he would call occasionally, but the purpose of the calls was to apologize for taking money and … he would not ask to speak to [N.K.].  Mother testified that Natural Father's contact with [N.K.] has been "sporadic" and that he has only had visits with [N.K.] a "handful of times."  Natural Father's last visit with [N.K.] was in 2020 when Mother and [N.K.] visited him.  The visit lasted approximately one (1) hour; [N.K.] was described to have more interaction with Natural Father's other child than with Natural Father.  After 2020, Natural Father reached out one time in an attempt to see [N.K.].  That occurred approximately 6-7 months ago by text message.  [Stepfather] responded to the text message by indicating that they would deal with his request in [c]ourt.  After the filing of the Petition, the parties described an interaction that occurred at the Blairsville Walmart where Natural Father confronted Mother and Stepfather, and [N.K.] ran away.

Approximately fifteen (15) months after [N.K.'s] birth, Mother and Step[father], her current husband, began a relationship. Stepfather has been involved in [N.K.'s] life since she was approximately fifteen (15) months old.  The relationship between Stepfather and [N.K.] was described as "inseparable."  Stepfather loves her, helps her with school work, and enjoys activities with her like ridding [*sic*] quads.  [N.K.] refers to Stepfather as "Dad"

and … Natural Father [by his first name]. [N.K.] knows that Natural Father is her father, but appears to have no bond or relationship with him. Stepfather has provided financial support, educational support, love, security, stability, and emotional support to [N.K.]. The testimony as presented was that Natural Father has never provided any financial support for [N.K.], has never sent or provided gifts, birthday cards, or birthday presents.

Mother testified that[,] with the exception of the response to the text message about 6-7 months ago, she has never refused Natural Father contact with [N.K.]. She has not blocked his phone or [in] any way prevented him from contacting her. Mother did testify that she may have blocked Natural Father from her social media accounts. Natural Father testified that he was texting Mother in 2020[,] and would even FaceTime Mother on his drives to work. However, this communication stopped when it appeared to cause conflict in Mother's marriage.

Counsel for [N.K.] … presented no testimony. However, she did advocate that it was the position of [N.K.] that she wants to be adopted by Stepfather.

Orphans' Court Opinion ("OCO"), 2/10/23, at 1-3 (internal citations omitted).

On November 14, 2022, the orphans' court entered a decree terminating Natural Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b). On December 12, 2022, Natural Father's counsel, Bradley M. Ophaug, Esq., filed a motion to withdraw. The orphans' court scheduled a hearing on January 11, 2023, to consider the motion. However, neither Natural Father nor Attorney Ophaug attended the hearing. Nevertheless, the orphans' court entered an order that same day granting Attorney Ophaug's motion to withdraw and appointing Natural Father new counsel. In addition, the orphans' court also reinstated Natural Father's appellate rights *nunc pro tunc*. On February 9, 2023, Natural Father filed a notice of appeal and a concise

statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Presently, Natural Father raises a single issue for our review:

Whether the [orphans'] [c]ourt erred in terminating [Natural Father's] parental rights to [N.K.], because … Petitioners failed to meet their burden by clear and convincing evidence, including, but not limited to[,] failing to identify how termination of [Natural Father's] parental rights would impact [N.K.], and whether a bond existed between [Natural Father] and [N.K].

Natural Father's Brief at 3.

On appeal, Natural Father complains that the orphans' court erred in terminating his parental rights "because Stepfather and … Mother did not meet their burden by clear and convincing evidence when it came to the issue of how this termination would impact N.K." *Id.* at 8. According to Natural Father, "there was *no* evidence presented to the [orphans'] [c]ourt in regards to the emotional and mental impact that termination of his parental rights would have on N.K. … [T]here was not proper evidence provided to the [c]ourt to show whether there was a bond between [Natural Father] and N.K." *Id.* (emphasis in original). Natural Father insists that a bonding assessment should have been conducted, and says that Petitioners should have provided testimony from a mental health professional on whether a bond exists. *Id.* at 16. In addition, he claims that Stepfather and Mother resisted his efforts to see N.K. *Id.* at 8.

Initially, we deem Natural Father's claims waived due to his failure to specifically raise them in his concise statement filed pursuant to Rule

- 4 -

1925(a)(2)(i). In his concise statement, he vaguely complained that "Mother and Step[father] did not meet their burden of *clear and convincing* evidence to warrant a termination of his parental rights to the above-named child." **See** Concise Statement, 2/9/23, at 1 (emphasis in original). Problematically, Natural Father failed to specify how Mother and Stepfather failed to meet this burden, or identify any of the specific errors that he complains of now. Accordingly, these claims are waived. **See** Pa.R.A.P. 1925(b)(4)(ii) ("The Statement shall concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge."); Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); **In re A.B.**, 63 A.3d 345, 350 (Pa. Super. 2013) ("When a court has to guess what issues an appellant is appealing, that is not enough for meaningful review. A Concise Statement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all.") (cleaned up).

Nevertheless, even if not waived, no relief would be due. In reviewing Natural Father's arguments, we are mindful that:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

Furthermore, we recognize that:

Termination of parental rights is governed by § 2511 of the Adoption Act[, 23 Pa.C.S. § 2101 *et seq*]. Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination. In evaluating whether the petitioner proved grounds under § 2511(a), the trial court must focus on the parent's conduct and avoid using a balancing or best interest approach. If the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under § 2511(b), which focuses on the child's needs and welfare.

This Court need only agree with any one subsection of § 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights.

*Id.* at 830 (cleaned up).

Here, the orphans' court terminated Natural Father's parental rights pursuant to Section 2511(a)(1) and (b).[1] Father only challenges the orphans' court's decision under Section 2511(b). Section 2511(b) provides:

> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

With respect to Section 2511(b), our Supreme Court has explained that "[t]he plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the 'primary consideration' must be the child's 'developmental, physical and emotional needs and welfare.'" *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). In undertaking this assessment, "courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent[,]" and "the court must determine each child's specific

---

[1] **See** 23 Pa.C.S. § 2511(a)(1) ("The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.").

needs." *Id.* at 1105, 1106 (citations and footnote omitted). "[T]he child's 'emotional needs' and 'welfare' include 'intangibles such as love, comfort, security, and stability.'" *Id.* at 1106 (citation omitted). In addition, "if the child has any bond with the biological parent, the court must conduct an analysis of that bond…." *Id.* (citation omitted). "It is only a necessary and beneficial bond, after all, that should be maintained when Section 2511(b) mandates the child's needs and welfare are of 'primary' importance. … [S]everance of a necessary and beneficial relationship is the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id.* at 1109-10 (citations omitted). *See also In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) ("In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case.").

Here, with respect to Section 2511(b), the orphans' court determined:

In [N.K.]'s entire life, her contact with Natural Father has been "limited" at best. Specifically, she has had no communication with Natural Father since a date in 2020. While [N.K.] knows Natural Father as her birth father, and recognizes him, there was no evidence presented to indicate that there is a bond of any sort. In fact, the evidence supports a conclusion that there is no bond. Specifically, the last time [N.K.] saw Natural Father is when he confronted Mother and Stepfather at Walmart, and [N.K.] ran away and hid. Stepfather has been the father figure in [N.K.'s] life since she was fifteen (15) months old. He has provided financially for Mother and [N.K]. Additionally, based on the testimony, this [c]ourt finds that Stepfather provides certain intangibles necessary for [N.K]. Those intangibles include but are not limited to love, comfort, education, security, and stability. As such, this [c]ourt finds by clear and convincing evidence that the

termination of Natural Father's rights and subsequent adoption by Stepfather furthers the developmental, physical, and emotional needs and welfare of [N.K.] and is in [N.K.'s] best interests.

OCO at 6-7.

Here, the record supports the orphans' court's conclusion that no bond exists between Natural Father and N.K. At the termination hearing, Mother testified:

[Petitioners' counsel:] And after 2017[,] do you recall how many times, if any, [Natural Father] physically saw the child?

[Mother:] Not very many. Maybe a handful of times.

[Petitioners' counsel:] And under what circumstances would he see her?

[Mother:] He would see [her] at my parents' house. I would take [N.K.] down to [Natural Father's] dad's house. She didn't really have anything to do with [Natural Father]. It was more his son … that she was more comfortable with. She would be excited to see him versus see[ing Natural Father].

… [N.K.] knows that [Natural Father's] her dad, you know, but she just is not comfortable around him due to hi[s] not being there. She knows he's her dad, and that's it. There's no father-daughter bond like there is with [Stepfather].

[Petitioners' counsel:] So during any interactions that you've observed between [N.K.] and [Natural Father], how would you describe those interactions?

[Mother:] Very distant. You know, like I said, … she would hug him just because I would say give him a hug; however, it wouldn't be like a father-and-daughter bond should be. Like I said, … she was more excited to see his son.

*** 

[Petitioners' counsel:] Do you recall the last time that [Natural Father] would have seen [N.K.]?

[Mother:] It was a couple years. I lived in Washington, PA. I finally got [Stepfather] on board to be able to bring her down to

see [Natural Father], and like I said, she was interacting more with [Natural Father's son]. It was all about [the son]. I mean, she didn't really care for [Natural Father].

\*\*\*

[Petitioners' counsel:] Now, you testified that you don't believe from your observations that there is a parent-child bond between [N.K.] and [Natural Father]. Do you believe that she has a parent-child bond with anyone other than you?

[Mother:] My husband[, Stepfather].

[Petitioners' counsel:] And can you describe why you think that there's a parent-child bond between her and [Stepfather]?

[Mother:] He has been an active, supportive, financial role in her life since she's been 15 months old.

[Petitioners' counsel:] How does she react to your husband?

[Mother:] They're best friends. They're inseparable. They are the bond of what a father-and-daughter bond should be.

[Petitioners' counsel:] Does she show your husband affection?

[Mother:] Absolutely.

[Petitioners' counsel:] And is that without you directing her to hug your husband?

[Mother:] Absolutely.

[Petitioners' counsel:] Does she initiate the affection?

[Mother:] Yes, she does.

\*\*\*

[Petitioners' counsel:] Now, after the filing of this petition, did you have any contact or see [Natural Father]?

[Mother:] We seen [*sic*] him in Walmart. … I think he came out of the back way bathroom or something, and he, you know, said things to [Stepfather] that, you know, to me would have escalated had I not stepped in between them, not so much on [Stepfather's] part, but you could tell [Natural Father] was very aggressive, not aggressive, but angry, upset. So I tried to de-escalate the situation, I did so, and we all left.

- 10 -

[Petitioners' counsel:] Was [N.K.] with you?

[Mother:] She was.

[Petitioners' counsel:] Did she see that altercation?

[Mother:] As soon as she seen [*sic*] [Natural Father], she literally ran and hid behind a shelf. She was terrified.

[Petitioners' counsel:] Was that before there were any words spoken between--

[Mother:] I think as soon as she saw [Natural Father], I think she ran. I didn't realize he was behind us until I heard him speak, and … by that time[, N.K.] was behind a shelf, and I de-escalated the situation. We got [N.K]. We all … left.

N.T., 11/8/22, at 8-10, 12-14.

In addition to Mother's testimony, Stepfather testified as follows:

[Petitioners' counsel]: Okay. Can you tell me if you have ever observed any visits between [N.K.] and [Natural Father]?

[Stepfather]: Yes, I have.

[Petitioners' counsel]: Could you tell me about those and when they would have occurred?

[Stepfather]: The last one I can remember was probably the one my wife was telling you about[,] probably about two years ago back in 2020[,] when we were at [Natural Father's] house. I think that's [Natural Father's] house. [N.K.] was, like my wife said, more interested in her brother, [Natural Father's] son, more than [Natural Father].

[Petitioners' counsel]: Do you recall about how long the visit lasted?

[Stepfather]: I would say probably about an hour, hour or so.

[Petitioners' counsel]: Were there any visits that you were present for before that one?

[Stepfather]: Not that I recall.

[Petitioners' counsel]: So, to the best of your knowledge, you were only present for one of them?

[Stepfather]: Correct.

[Petitioners' counsel]: And during that time, did you see [N.K.] on her own initiate any affection toward [Natural Father]?

[Stepfather]: No.

***

[Petitioners' counsel]: Can you tell the [c]ourt what your relationship with [N.K.] is like?

[Stepfather]: Very inseparable. I love that little girl. Just a father-daughter relationship. I mean, we do everything together, schoolwork, ride quads. I raised her since she was about 18 months old, so…[.]

*Id.* at 26-27, 28-29.

Maternal Grandmother, who lives next to Petitioners, also confirmed that the bond between N.K. and Stepfather is "great." *Id.* at 41, 42. She described that "[t]hey're always together, laughing, carrying on, having fun." *Id.* at 42. In comparison, she recounted that, the last time that she saw N.K. with Natural Father, N.K. did not pay attention to him. *Id.* at 41.

Finally, N.K.'s attorney made the following statement on the record at the hearing:

Your Honor, obviously [N.K.] is not present due to the nature of these proceedings. I did have a chance to meet with her, and I have spoken with her on the phone. She has expressed to me that she very much looks to [Stepfather] as her father and she very much would like to make a permanent relationship moving forward.

She's also indicated to me when we've spoken that she refers to [Natural Father by his first name]. She never mentions him as dad. She called him [by his first name] every single time I asked a question.

- 12 -

> Now, when I would talk about [Stepfather]…, she would refer to him as dad, and she would indicate that that's who she views as dad.
>
> And she would clam up or get very shy and was not too forthcoming when I would ask about [Natural Father], and it seemed as though she was a little bit afraid to speak about him, but she did indicate to me that she very much would like to be adopted by [Stepfather].

*Id.* at 55.

Based on the foregoing, even if properly preserved, we would conclude that the record supports the orphans' court's determination that no bond exists between N.K. and Natural Father. As Petitioners observe, "there is no bond between Natural Father and [N.K.], and therefore, it is illogical to ask whether N.K. would be emotionally impacted by severing the bond between her and Natural Father when such a bond does not exist in the first place." Petitioners' Brief at 4; *see also id.* at 3-4 ("It is true that the evidence presented on the issue of bond and the effect of severing the bond in this matter was limited. The reason for this is that there is not much that can be said under the circumstances. If there was a history of significant interactions between Natural Father and N.K., more testimony on the potential existence of a bond could have been presented. However, that is not the case."). *Accord In re K.Z.S.*, *supra* ("In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case.").

Furthermore, as to Natural Father's insistence that a bonding assessment should have occurred and mental health professionals should have testified, we note that no expert testimony is required and Section 2511(b) "does not require a formal bonding evaluation." **See In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted); **see also Interest of: J.D.**, 2021 WL 5326477, at *5 (Pa. Super. filed Nov. 16, 2021) ("[T]o the extent [the m]other argues that an expert opinion or formal analysis is necessary, that requirement is not borne out by our case law.") (citation omitted).[2]

Finally, to the extent Natural Father claims that Petitioners resisted his efforts to see N.K., we would similarly determine that no relief is due on this basis. The orphans' court explained:

> Natural Father also testified that he believed that Stepfather interfered with his ability to assert his parental rights. This [c]ourt finds no credible evidence to support that claim. There is[,] and has always been[,] a perfectly viable option for Natural Father to assert his parental rights, that being a custody action, which he failed to pursue. In fact, the mere filing of a complaint may have constituted an affirmative performance of a positive parental duty which would have negated termination under [S]ection 2511(a)(1).

> Natural Father has had little to no involvement in [N.K.]'s life. He failed to utilize resources that may have been available even when he was incarcerated to maintain any relationship with [N.K]. He never wrote to [N.K.], never sent any cards, never made any calls

---

[2] **See** Pa.R.A.P. 126(b) (stating that an unpublished non-precedential memorandum decision of the Superior Court filed after May 1, 2019 may be cited for its persuasive value).

- 14 -

to speak with [N.K].[3]  Natural Father did testify that he had mailed letters to Mother's Aunt and that those letters addressed [N.K].  However, this [c]ourt is free to make credibility determinations and finds that testimony as to the letters to the extent that they may have included communication to [N.K.] was not credible.

OCO at 6 (internal citation omitted).  Because of Natural Father's failure to pursue custody of N.K., along with his lack of effort to communicate with her, we would be unconvinced by his argument that Mother and Stepfather are to blame for his not having a relationship with N.K.  Accordingly, we affirm the orphans' court's decree.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/19/2023

_____

3 **See** N.T. at 10-11 (Mother's testifying that, between 2020 and mid-2022, Natural Father sent N.K. no birthday cards, no birthday presents, and no letters, and made no phone calls asking to speak to N.K.); **but see id.** at 34-35 (Stepfather's stating that, while Natural Father has sent N.K. no letters, birthday cards, or presents, he may have called to speak to N.K. "once or twice" when he first got out of jail years ago).  **See also id.** at 23-24 (Mother's conveying that, although she blocked Natural Father on social media, she never blocked him from calling her).

- 15 -