J-S15030-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: S.A.M.-N., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.N.-A., MOTHER | |
| | No. 476 EDA 2026 |

Appeal from the Decree Entered January 21, 2026
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000301-2025

| | |
|---|---|
| IN THE INTEREST OF: S.A.M.-N., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.N.-A., MOTHER | |
| | No. 477 EDA 2026 |

Appeal from the Decree Entered January 21, 2026
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000302-2025

BEFORE:   OLSON, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:                    **FILED JUNE 2, 2026**

S.N.-A. (Mother) appeals from the juvenile court decrees, which granted

the petitions filed by the Philadelphia Department of Human Services (DHS or

the agency) and involuntarily terminated Mother's parental rights to her minor

_____

[*] Former Justice specially assigned to the Superior Court.

twin sons, S.A.M.-N. and Sy.A.M.-N. (Sy.) (collectively, Children) (born in December 2021).[1] After careful review, we affirm.

Mother (who was 17 years old at the time) prematurely gave birth to Children after thirty-four weeks of gestation. DHS became involved within the first three months of Children's lives, after receiving a General Protective Services (GPS) report concerning medical neglect. In its petitions to terminate Mother's parental rights (TPR Petition), DHS alleged the following:

> a. … [T]he last medical appointment [Children] attended was on January 18, 2022[,] and at this appointment, [Sy.]'s weight was observed to be below average[,] and it was recommended that his weight be monitored[. The GPS report also alleged] that both Children were behind on immunizations; and that their medical appointments were missed on February 9, 2022, February 17, 2022, February 22, 2022, and March 14, 2022; and that appointments had been made with both … [Mother] and their maternal grandmother, [D.A. (Maternal Grandmother)]. The report was determined to be valid.
>
> b. DHS learned that [Sy.] was not feeding well and often vomited. DHS learned that [Children] had missed seven medical appointments since they were discharged from the hospital in early January 2022.
>
> c. On March 24, 2022, the family began receiving services from [the] Community Umbrella Agency (CUA)[,] Turning Points for Children.
>
> d. On June 8, 2022, CUA conducted a home visit with [Mother]. [Mother] stated that the Children had medical appointments scheduled for June 23, 2022. [Mother] did not keep the appointment but subsequently kept an appointment on July 1, 2022.

___

[1] Children's biological father, A.S.M., voluntarily relinquished his parental rights to Children, and is not a party to this appeal.

- 2 -

e. On July 12, 2022, CUA conducted a home visit with [Mother] and reminded her that the Children had a medical appointment scheduled on July 14, 2022. No formula was observed in the home, and CUA arranged to have formula delivered to the home.

f. CUA received allegations that [Maternal Grandmother] was selling [Mother's] food stamps, and CUA encouraged [Mother] to apply for public assistance benefits in her name for the Children.

TPR Petition, 6/25/25, ¶ 14(a)-(f).

CUA held a Single Case Plan (SCP) meeting on August 24, 2022. Mother participated in the meeting. The SCP identified the goal for Children as "Stabilize Family Functioning." The SCP also detailed Mother's parenting objectives, which primarily concerned Children's medical care.

Following the initial SCP meeting, CUA continued to note concerns about Children's health and lack of attendance at medical appointments:

h. On December 7, 2022, CUA conducted a home visit with [Mother] and observed that the Children's eczema appeared to be getting worse with red, swollen scars and open wounds on their face[s] and arms. The Children were observed to be crawling on a floor that was unclean. [Mother] stated that she had a medical appointment scheduled for the Children on December 23, 2022. [Mother] did not keep that appointment.

i. [Mother] did not keep another medical appointment for the Children after July 12, 2022[,] until January 19, 2023.

j. On February 28, 2023, CUA conducted a home visit with [Mother] and observed that the Children did not have appropriate sleeping arrangements[,] and their eczema appeared inflamed with red, scaly, dry patches of skin on their legs and hands. The Children appeared irritable and uncomfortable. DHS implemented a safety plan with the [Children's] paternal grandfather….

….

l. On April 14, 2023, CUA conducted a home visit with [Mother]. The Children's skin appeared to be inflamed and infected[,] and they were wearing unclean diapers. [Sy.] was observed to have a bulging belly button. [Mother] had previously been provided with beds for the Children but had yet to assemble them, stating that the family planned to move.

*Id.* ¶ 14(h)-(l) (some capitalization modified).

CUA held a revised SCP meeting on April 26, 2022. Mother did not participate in this meeting. The goal for Children remained "Stabilize Family Functioning." *Id.* ¶ 14(m). In addition to the previously outlined parental objectives, the SCP identified additional objectives, which, *inter alia*, directed Mother to seek transportation assistance for Children's medical appointments and to enroll in government assistance programs. *See id.*

In May 2023, Mother took Children to their well-child checkup, accompanied by CUA and a DHS nurse. "[Mother] needed assistance changing the [C]hildren into their exam gowns, as she was preoccupied with her cell phone." *Id.* ¶ 14(n). During the appointment, Mother was instructed to make additional appointments for Children, but Mother did not schedule the appointments. Mother also failed to take Children to their dental appointments.

CUA held a revised SCP meeting on June 23, 2023, in which Mother did not participate. Children's goals and Mother's parental objectives remained the same.

u. On June 28, 2023, DHS received allegations that [Mother] failed to comply with recommendations to take the Children to the dermatologist for their severe eczema, and for lab work and

allergy testing; that the Children ha[d] not received medical care since May 21, 2023; that [Mother] had not responded to outreach for St. Christopher's Hospital for Children; and that when [Maternal Grandmother] was incarcerated, the Children's minor maternal aunt transported the Children to the home of another maternal aunt, … where the Children remained.

….

w. [Mother's] home continued to be inappropriate for the Children. The home has dog feces on the floor, piles of trash, minimal food, a lack of furniture[,] and a mice infestation. Open liquor bottles within reach of the Children have been observed. The home did not have appropriate sleeping arrangements for the Children and thus, beds were supplied for the Children[,] but the beds remain unassembled. Despite being warned of the danger, [Mother] continued co-sleeping with the Children on a mattress on the floor.

*Id.* ¶ 14(u), (w) (some capitalization modified).

Following a hearing on October 30, 2023, the juvenile court adjudicated Children dependent.[2] The juvenile court referred Mother for various services and permitted Mother to have supervised visits with Children.

Subsequently,

[o]n December 14, 2023, CUA held a revised SCP meeting for [Children]. The goal identified for [Children] was "Return to Parent." The parental goals established for [Mother] were to: 1) attend all medical appointments and follow-ups for [Children;] 2) access St. Christopher Tower Health Center portal to ensure [Mother] is informed about upcoming doctor appointments[;] 3) sign all necessary medical consents[;] 4) ensure the safety and well[-]being needs of [Children;] 5) participate in parenting[] education group, housing and employment at [Achieving Reunification Center (ARC);] 6) attend [the Clinical Evaluation Unit (CEU)] for a forthwith drug and alcohol screen, dual

_____

[2] We note that the certified record before this Court does not contain any of the filings from the dependency dockets.

diagnosis, and three random drug and alcohol screens[;] 7) obtain suitable housing wi[th] all operable utilities[;] 8) comply with CUA services and court orders[;] 9) adhere to the supervised visitation[;] 10) sign all agency releases and consents[;] and 11) engage in all case planning meetings and trainings as recommended. …

*Id.* ¶ 14(y).

CUA held revised SCP hearings on September 11, 2024, and November 15, 2024. Following each of those hearings, CUA identified the same goals for Children and the same parenting objectives for Mother.[3]

On May 12, 2025, CUA held another revised SCP meeting, in which Mother participated. Thereafter, Children's goals were identified as "Adoption." The SCP identified the same parental objectives for Mother.

DHS filed the underlying termination petitions on June 25, 2025, seeking termination of Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

On October 6, 2025, Children were placed in the care of N.F. (Foster Mother), and they have resided with Foster Mother continuously since that time.

_____

[3] On April 15, 2025, Mother entered a guilty plea to robbery and related offenses. The circumstances surrounding these convictions and the resulting judgment of sentence are not apparent from the certified record. However, Mother acknowledges that she was "incarcerated back and forth" throughout the history of this case. Mother's Brief at 18 (citing N.T., 11/4/25, at 29).

The juvenile court conducted hearings on November 4, 2025, and January 16, 2026. Mother appeared and was represented by counsel. Children were represented by a guardian *ad litem* (GAL).[4] The juvenile court heard testimony from the CUA case manager, Clayton Graves (Mr. Graves). Mother also testified on her own behalf. At the close of the January 16, 2026, hearing, the juvenile court granted DHS's petitions and entered decrees terminating Mother's parental rights to Children pursuant to Section 2511(a)(1), (2), (5), (8), and (b).

Mother filed timely notices of appeal, as well as contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statements of errors complained of on appeal.[5]

Mother raises the following issues for review:

1. Whether the trial court committed reversible error when it involuntarily terminated Mother's parental rights[,] where such determination was not supported by clear and convincing evidence under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8)?

2. Whether the trial court committed reversible error when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the Child[ren] as required by the Adoption Act, 23 Pa.C.S.A. § 2511(b)?

_____

[4] Because Children were 3 years old at the time of the first hearing, they were unable to articulate their preferences regarding termination of Mother's parental rights. Thus, the juvenile court found that there was no conflict between Children's legal and best interests. *See* N.T., 1/16/26, at 12.

[5] This Court *sua sponte* consolidated Mother's appeals.

Mother's Brief at 8 (some capitalization and punctuation modified).

We address Mother's claims together.[6] Mother contends that DHS failed to establish grounds for termination under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), because she had made progress toward her SCP objectives and remedying the issues that led to Children's placement. *See id.* at 17-20. Mother claims she completed her dual diagnosis assessment, achieved certificates for two of ARC's workshops, and enrolled in parenting classes in September 2025. *Id.* at 19. Additionally, Mother argued her inability to attend scheduled visits with Children because of periods of her incarceration. *Id.* at 18.

Concerning Section 2511(b), Mother asserts the juvenile court erroneously concluded the termination of her parental rights serves Children's best interests. Mother's Brief at 20. Mother points to Mr. Graves's testimony that when Children visit Mother, they hug her and start playing with her. *Id.* at 20-21. According to Mother, this is conclusive evidence that Children "know and love" Mother. *Id.* at 21.

> In considering Mother's claims, we recognize
>
> appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an

_____

[6] We observe that Mother's arguments are minimally developed.

appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion[,] or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

**Interest of M.E.**, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted); **see also In re Adoption of G.W.**, 342 A.3d 68, 84 (Pa. Super. 2025) (*en banc*) (reiterating that "our job is to review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; we may not search the record for contrary conclusions or substitute our judgment for that of the trial court." (citation, quotation marks, and brackets omitted)).

Further,

[i]n considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of … her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, directly, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

**Interest of M.E.**, 283 A.3d at 830 (internal citations and quotation marks omitted).

- 9 -

Here, the juvenile court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). This Court may affirm the juvenile court's decision to terminate parental rights if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b). *Id.* We will examine Mother's argument concerning Section 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for h[er] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b).

To satisfy the requirements of Section 2511(a)(2), the petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination under this subsection "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.*; *see also In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) ("[S]ubsection (a)(2) does not emphasize a parent's refusal to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control[,] or subsistence necessary for his physical or mental well-being." (citation omitted)). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019).

Moreover, a parent's "incarceration is a factor, and indeed can be a determinative factor" when considering termination under subsection 2511(a)(2), "where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control[,] or subsistence[,] and that the causes of the incapacity cannot or will not be remedied." *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012).

At the close of the January 16, 2026, termination hearing, the juvenile court found that DHS established the statutory grounds for termination under subsection 2511(a)(2):[7]

> [Mother's] objectives included [requirements for her to] attend medical appointments, which she did once in 2023; follow court orders; attend ARC for parenting, housing, and employment, which she's recently begun; and obtain housing, which she testified that she has.
>
> [Mother] was also to have random screens at the CEU, which she did two times: once in February of 2024 and again in May of 2025.
>
> [Mother] was also to have supervised visits at the agency. The CUA case manager testified that the visits were okay[,] but inconsistent. Since September of 2025, five out of 12 visits were missed.
>
> The court orders reflect that [Mother's] compliance and progress ranged from none to minimal during the two years that [Children] have been in foster care. [Mother's] explanations [for her noncompliance] included that she did not want to look bad, phone issues, as well as periods of incarceration.
>
> ….
>
> The testimony also reflects that there's not been sufficient compliance nor progress for reunification at this time and will not be sufficient for reunification in the near future.

N.T., 1/16/26, at 13-14.

Our review confirms the juvenile court's findings are supported by the record and free of legal error. Mr. Graves, CUA's case manager, testified that

---

[7] The juvenile court did not separately detail its reasoning in its Rule 1925(a) opinion, and instead directed us to its statements made on the record. **See** Rule 1925(a) Opinion, 2/25/26, at 2 (unnumbered).

Children were adjudicated dependent and placed in DHS's custody as a result of medical neglect. N.T., 11/4/25, at 8. Mr. Graves detailed Mother's SCP objectives (which we described in full, *supra*) and testified that Mother was aware she needed to complete the objectives in order to be reunified with Children. *Id.* at 9-10.

Concerning Mother's compliance with the SCP objectives, Mr. Graves testified that Mother accompanied Children to a medical appointment in 2023 but has not attended any appointments since then. *Id.* at 10. Mr. Graves stated that Mother completed only two random drug and alcohol screens. *Id.* at 10-11. According to Mr. Graves, Mother began participating in ARC programs for workforce development, housing, and plan placement in September 2025, three months after DHS filed the instant termination petitions. *Id.* at 11. Mr. Graves acknowledged that Mother resides with Maternal Grandmother, and her housing is considered appropriate. *Id.* at 17; *see also id.* at 18 (explaining Maternal Grandmother has a bedroom that could be used for Children, but that it is not furnished).

Additionally, Mother participated in supervised visits with Children at the agency. Mr. Graves testified that the visits "go okay." *Id.* at 11. Mr. Graves explained that during visits, Mother often spent time talking to other individuals on her phone. *Id.* Mother's participation in visits was not consistent. *Id.* at 12; *see also id.* at 22, 24 (indicating that Mother attended 5 out of 12 scheduled visits since the previous permanency hearing).

Additionally, Mr. Graves testified that Mother has provided no financial support for Children. *Id.* at 12; *see also id.* at 22 (stating that Mother is not employed).

Children's GAL also argued that, "[a]fter more than two years, Mother still has not completed basically any of her objectives." *Id.* at 38. Children's GAL described Mother's visits as "very, very[] sporadic," noting that Children did not see Mother for months at a time. *Id.*

Mother explained that she missed scheduled visits with Children because she was "incarcerated back and forth," and her phone was broken. *Id.* at 29-30. Mother cited her continued marijuana use as the reason she neglected to complete random drug screens. *Id.* at 30-31 ("[W]hen I had the randoms, they told me that I couldn't smoke weed. So I was smoking (unintelligible) when my kids [were] gone, and I didn't want it … to look bad on me…."). Mother also confirmed that she is unemployed. *Id.* at 32.

Accordingly, the record confirms that Mother's participation in visits with Children has been inconsistent, and her compliance with her SCP goals has been minimal, at best, throughout the history of this case. While Mother began participating in some ARC programs, her efforts did not begin until recently (three months after DHS filed the termination petitions). Perhaps most significantly, as the impetus of this case was medical neglect, Mother attended only one medical appointment with Children since 2023. Thus, we discern no error or abuse of discretion in the juvenile court's determination

that DHS proved, by clear and convincing evidence, that termination of Mother's parental rights is warranted under subsection 2511(a)(2).

Because the evidence supports termination under Section 2511(a), we next examine Children's needs and welfare pursuant to Section 2511(b). *See In re K.Z.S.*, 946 A.2d 753, 760 (Pa. Super. 2008) ("Once the statutory grounds for termination under Section 2511(a) have been met, the court must consider whether the child's needs and welfare will be met by termination pursuant to Section 2511(b)."). "The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the primary consideration must be the child's developmental, physical and emotional needs and welfare." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (quotation marks omitted). Consideration of a child's best interests must be made on a case-by-case basis, keeping in mind the child's particular needs. *Id.* at 1105-06.

This Court has repeatedly explained that a child's needs and welfare "include intangibles such as love, comfort, security, and stability." *Interest of M.E.*, 283 A.3d at 836 (citation omitted). "[I]f the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task." *Interest of K.T.*, 296 A.3d at 1106 (citation omitted).

> The [juvenile] court must determine whether the parent and child share an emotional bond and assess whether the bond is necessary and beneficial to the child, such that maintaining the bond serves the child's developmental, physical, and emotional

- 15 -

needs and welfare. If a bond exists, the court must ascertain the effect upon the child of severing the bond. Because the severing of any parent-child bond may be emotionally painful for a child, the [juvenile] court cannot preclude termination based solely on evidence of an adverse or detrimental impact to the child. Instead, focusing upon the child's development, and mental and emotional health, the orphans' court should assess whether severing the bond is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm to the child.

*In re Adoption of G.W.*, 342 A.3d at 90 (internal citations and quotation marks omitted); *see also In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) ("[T]he mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition.").

Regarding Children's best interests under Section 2511(b), the juvenile court found as follows:

The testimony [] reflects that [Children] are in a home with a resource parent[, *i.e.*, Foster Mother,] who established a relationship with them before they moved to her home six months prior to the goal change [and] termination hearing date. [Children] are very bonded to [Foster Mother] and refer to her as [m]other. [Foster Mother] provides love, comfort, support, and is attending to their needs. [Foster Mother] wants to adopt them.

….

[The court finds] that [C]hildren should not languish in foster care indefinitely while waiting for [Mother] to achieve [her] reunification goals.

[The court finds] that termination would not cause [Children] irreparable harm, nor would it destroy a necessary and beneficial relationship. [Children] do not look to [Mother] to meet any of their needs.

These [C]hildren should have permanency, and [the court finds] that it is in their best interest for the goal to be changed to adoption and [for Mother's] parental rights [to be] terminated.

N.T., 1/16/26, at 14-15.

The juvenile court's findings are amply supported by the record and free of legal error. Mr. Graves testified that, at the time of the first termination hearing in November 2025, Children had been residing with Foster Mother for approximately six months. N.T., 11/4/25, at 14. Mr. Graves also explained that Children had established a relationship with Foster Mother prior to that time, as she served as a resource parent during their medical foster placement. *Id.*

According to Mr. Graves, Children are "[v]ery bonded" with Foster Mother, and "look for her to provide the primary safety[,] care, support, structure, and love that they need…." *Id.* at 15; *see also id.* (stating that Children are up to date with their medical and dental appointments). Mr. Graves confirmed that Foster Mother provides safety and stability for Children. *Id.* Mr. Graves opined that Children would suffer harm if they were removed from Foster Mother's care. *Id.* at 16. By contrast, Mr. Graves believed Children would not suffer irreparable harm if Mother's parental rights were terminated. *Id.*

Further, Children's GAL represented that Children are "very, very bonded" with Foster Mother and are "doing wonderful" in Foster Mother's home. *Id.* at 38. The GAL also stated that Children refer to Foster Mother as

"Mommy." ***Id.*** As the juvenile court's findings are supported by the record, and we otherwise discern no error or abuse of discretion, Mother is not entitled to relief.

Based upon the foregoing, we affirm the juvenile court decrees terminating Mother's parental rights to Children.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/2/2026